12698

STATE EX REL. DANIEL, ATTORNEY GENERAL, v. BROAD
RIVER POWER CO. *ET AL.*

(153 S. E., 537)

*Messrs. John M. Daniel, Attorney General, Cordie Page, Assistant Attorney General, Melton & Belser, Irvine F. Belser, C. T. Graydon, W. S. Nelson, E. W. Mullins* and *H. N. Edmunds,* for petitioners,

*Messrs. Elliott & McLain, J. B. S. Lyles, E. Edward Paxon* and *George M. LePine,* for respondent,

July 9, 1929.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

We desire to state at the outset that the Court, in the preparation of its opinion in this case, has followed, in the main, the well-prepared argument of counsel for petitioners.

This proceeding, commenced July 19, 1927, is in the original jurisdiction of this Court for a writ of mandamus requiring and compelling the respondents to resume and continue the operation of the electric street railway system in the City of Columbia and other places near said city, the operation having been discontinued March 11, 1927. The alleged facts upon which the proceeding is based are set forth in the petition of the said John M. Daniel, Attorney General, which petition will be included in the report of the case. At the time of filing the petition an order to show cause was issued. Later, by intervening petitions and orders issued thereon, a number of other parties were permitted to come into the cause, namely, the South Carolina Railroad Commission, the North Columbia Land Company, City of Co-

lumbia, W. B. Burney, Columbia College, Chicora College, School Board of the City of Columbia, Town of Eau Claire, and the Town of Arden. To the several petitions the respondents filed demurrers, returns and answers. The petitioners moved to strike out the demurrers and returns, and in addition filed reply. Let it be stated in this connection that the rights of the intervening petitioners are properly determinable in this proceeding.

After hearing argument on the pleadings, this Court issued an order referring the cause to Honorable L. D. Lide, as special referee, to pass upon all issues of law and fact, directing him to take the testimony and report his conclusions. While we are unable to agree to the conclusion reached by the special referee in holding that the petitions should be dismissed, and as to certain views expressed, we fully recognize and appreciate the splendid service he has rendered the Court and the full, able and painstaking report made by him in the case, and we are in accord with his view as to some phases of the case, to which we shall hereinafter call attention.

On account of certain action in the United States Court on the part of the respondents Columbia Railway, Gas & Electric Company, the details of which action are fully stated in the report of the special referee, the procedure in this Court was stayed for a time as to this respondent, but on April 2, 1928, by order of the Honorable Ernest F. Cochran, Judge of the United States District Court, the stay order in that Court was dissolved and the action in this Court proceeded against all of the respondents.

The referee having overruled the petitioners' motions to strike out the several returns and answers of the respondents, and having also overruled the demurrers interposed by the respondents, he proceeded to take the testimony offered by the parties to the cause. From the referee's report, recommending that all of the petitions be dismissed, the petitioners have appealed. The respondents ask that the *"final conclusions"* of the referee be sustained on the grounds stated by

him, and on other additional grounds, to which we shall hereinafter call attention.

As stated by the respondents, the principal defense of the respondents is that such railway cannot be operated except at a loss, and that to grant the relief prayed for would result in the taking of the property of the respondents without due process of law, in violation of the State and Federal Constitutions. It is also contended by respondents that if any liability exists it is the liability of Columbia Railway, Gas & Electric Company, and in no event is there any liability on the part of Broad River Power Company and F. D. Campbell, it being contended by respondents that the Broad River Power Company is a separate and distinct corporation from that of the Columbia Railway, Gas & Electric Company, and that there is no connection between the two companies as to the matters involved in this cause; and further contends, in this connection, "that the passage of the Act of 1925, authorizing the sale by Columbia Railway, Gas & Electric Company of its gas and electric properties to Broad River Power Company was part of the settlement of the canal controversy between the State and the Railway Company, and that the State could not attack the same." The referee ruled adversely to this contention of respondents, and held that "the railway company was a mere department or instrumentality of the power company, and that for the purposes of this case the two companies must be treated as one." We fully agree with the referee as to this holding, and the alleged error imputed to the referee by the respondents in this holding does not furnish an additional ground for sustaining the "final conclusions" of the referee, namely, that the petitions should be dismissed.

On this question, under "Statement of Facts," the referee has the following to say, which is pertinent to the questions before the Court (it will be noted that when the referee uses the term "Railway Company" or Columbia Railway Com-

pany he has reference to Columbia Railway, Gas & Electric Company) :

"Some time during the year 1924 W. S. Barstow and his associates, well known in this sphere of enterprise, became interested in the public utility business of the City of Columbia, and during this year acquired all or substantially all of the capital stock of the Columbia Railway Company. The testimony is to the effect that the prospects appealed to them because there was an acute shortage of power in this locality, but unusual sources for its production in connection with the Columbia Canal and otherwise. At that time the Canal Commission appointed by the General Assembly was functioning for the purpose of settling the controversy between the State and the Columbia Railway Company relating to this canal, a much vexed problem. The Barstow interests organized a corporation under the laws of this State under the name of Broad River Power Company for the purpose of acquiring the stock of Columbia Railway Company with the intention of enlarging the business by establishing new and improved power developments and ·otherwise. The charter was granted by the Secretary of State under the general law on July 19, 1924, and was amended on November 14, 1924, so as to increase the authorized capital stock to $20,000,000.00. The actual stock finally issued, both common and preferred, was $8,138,900.00. Bonds were eventually floated to the extent of about thirteen million dollars. The general nature of the business proposed to be done by this corporation is set out in the charter at great length, including, among many other things, the building, constructing, acquiring by purchase, lease, consolidation, merger or otherwise, and operation of street railways, etc.

"The representatives of the Barstow interests entered into negotiations with the Canal Commission for the settlement of the canal controversy, and after numerous conferences a settlement was agreed upon. On July 17, 1924, The General Finance Corporation, one of the Barstow companies, ad-

dressed a proposal to the commission for the settlement of the canal controversy, submitting therewith a draft of two bills to be enacted by the Legislature, one a bill to settle the canal controversy, and the other a bill authorizing Columbia Railway, Gas & Electric Company and six other corporations subsidiary to it, including Columbia Gas Light Company, to merge or consolidate with, or to sell, transfer and convey to any one or more of them or to the Broad River Power Company all or any part of their respective properties, assets, franchises, charter or other rights, etc. The latter bill, which was subsequently enacted, is frequently called by the petitioners the merger Act, and by the respondents the enabling Act. To avoid confusion it will hereafter be called the *merger or enabling Act.*

"The business terms of the bill settling the canal controversy were finally adjusted and agreed upon, and the commission recommended to the General Assembly a settlement of the rights of the State in and to the Columbia Canal in accordance therewith. The final draft of the settlement bill as submitted by the Barstow interests contained a recital that the General Assembly had passed the merger or enabling Act, but at the instance of the commission this recital was stricken out. After the form of the settlement bill had been finally agreed upon, the members of the commission signed letters addressed to Columbia Railway, Gas & Electric Company, in which they stated that they approved both of the bills 'in the forms submitted to us and as amended by us this day, and thereafter agreed to by you.' They further stated in these letters that since the bills were now satisfactory, they would recommend their passage and approval. The Act setting the canal controversy was duly passed by the General Assembly and was approved March 24, 1925 (34 St. at Large, page 852). The merger or enabling Act was duly passed by the General Assembly and approved March 19, 1925 (34 St. at Large, page 842).

"Mr. W. D. Barnett, who was a member of the Canal Commission and its secretary, testified in regard to these negotiations. He says that no formal minutes were kept of the meetings of the commission, but that his recollection was that the purchasers of Columbia Railway, Gas & Electric Company wanted the merger or enabling Act for financial reasons, and that while the members of the Canal Commission took the view that they had no authority with reference to this Act, they were willing to assist the Barstow Company in getting their financial matters straight as a matter of accommodation. 'Some one asked if the purpose was not to eventually stop the street cars. They stated the object was to enable them to finance the operations here and not to stop the street cars—that is my recollection of it.' He testified further that some member of the Canal Commission said, 'We have nothing to do with that phase of it, that wasn't the duties of the Canal Commission.' There is no reference made in the Act settling the canal controversy or in the contract therein set out to the merger or enabling Act.

"The testimony in behalf of the respondents tends to show that it was very desirable to have the street railway property separated from the rest of the business in order to do the financing necessary for the contemplated developments. It was said that traction securities are regarded very unfavorably by the public, and public utilities with a losing traction department are also handicapped, and that hence it would have been very expensive to have done this financing without the separation. Assuming all this to be correct, the referee concluded as a matter of fact that the merger or enabling Act was not a part of the canal settlement. Waiving the question as to whether the commission as a matter of law had anything to do with the terms of the merger or enabling Act, it is clear from all the facts and circumstances that their understanding was as stated by Mr. Barnett. If they recommended the passage of this Act they acted individually and independently of their official duties in reference

to the settlement of the canal controversy, and it seems to the referee that they made this plain when they struck out the reference to the merger or enabling Act in the settlement Act. This conclusion is far from imputing fraud to the respondents and is not so intended. The referee infers from the situation that if the Canal Commission had considered their recommendation of the merger or enabling Act as a part of their official duties, they would have ascertained more fully its possible effect.

"Before and after the settlement of the canal controversy and the adoption of the Acts just referred to, several bond issues were negotiated by Broad River Power Company. The circulars relating to these bond issues, or some of them, were introduced in evidence, and they included statements made in the name of Mr. W. S. Barstow, President. There were also introduced in evidence statements relating to these bond issues taken from the *Commercial and Financial Chronicle* of New York City, a bond journal. Mr. J. P. Campbell, who was treasurer of both Broad River Power Company and the Columbia Railway Company, testified that the statements in the name of Mr. Barstow were prepared by the witness, and that while the references in the bond journal were news items rather than advertisments, the information therein contained was presumably procured from his office directly or indirectly in a lawful manner. Hence, notwithstanding the objections of respondents the statements contained in the bond journal are considered in evidence as well as those in the circulars. It will not be necessary to recite them all, but in one issue of the bond journal it was stated that Columbia Railway, Gas & Electric Company and its subsidiary, The Parr Shoals Power Company, had been in successful operation over a long period of years. Also, in one of the issues (January 3, 1925) there was a statement giving the consolidated earnings of the several companies indicating a very profitable operation, but showing upon an analysis thereof an operating loss on the rail-

way department. It was stated in the circular dated November 10, 1924, that Broad River Power Company was organized in July, 1924, for the purpose of acquiring the entire outstanding common and preferred stock of the Columbia Railway, Gas & Electric Company, which owned or controlled all the outstanding common stock of The Parr Shoals Power Company and the Columbia Gas Light Company; that Columbia Railway, Gas & Electric Company had been in active operation in Columbia since 1891, and that it was intended that the Broad River Power Company would effectuate the transfer to itself of all the physical properties, franchises and other assets of Columbia Railway, Gas & Electric Company and its two subsidiaries above mentioned ('except that the street railway properties may be held in a separate ownership') after expected authorization by the Legislature of South Carolina at its next session in January, 1925.

"Purporting to proceed under the authority of the merger or enabling Act, there was conveyed to Columbia Railway, Gas & Electric Company all the property of its subsidiaries by deed or deeds dated June 15, 1925, and on the same day Columbia Railway, Gas & Electric Company, also purporting to act under the authority of the merger or enabling Act, executed a deed to Broad River Power Company wherein and whereby it conveyed all the property theretofore owned by it, including that which it had acquired from its subsidiaries on that day, excepting only its franchise to operate and maintain its street railway within and without the City of Columbia and other municipal corporations in Richland County; all easements, right-of-way, rights and privileges necessary for operation of the street railway; all street cars, tracks, ties, overhead conductors, brackets, spans, tools, repair equipment, material and supplies, used or useful exclusively for street railway purposes; and a certain strip of land thirty feet in width. The evidence shows that the property of the subsidiary corporations was conveyed to the railway

company for the reason that its outstanding mortgage carried as a part of the security the stocks of the subsidiaries, and it was, therefore, necessary to put the title to the property in the railway company so as to bring it under the lien of the mortgage, in lieu of the stocks. The deed to Broad River Power Company expressly includes 'all poles, including those used exclusively for street railway.' The evidence further shows that the poles carrying the trolley wires for the operation of the street cars also carry the wires for the transmission of electric current, or that this is true to a large extent. There was also included in the conveyance to Broad River Power Company the substation and the car barn which, of course, had been used at least principally in connection with the street railway business.

"Broad River Power Company upon its organization issued its own stock to the extent of $3,449,300.00 in exchange for the common stock of Columbia Railway, Gas & Electric Company and its subsidiary, The Parr Shoals Power Company. There was also paid in for common stock at the time of the organization $449,000.00 in cash. The total amount which has actually been paid in to Broad River Power Company for common stock in money is $2,129,-400.00. The physical property acquired by Broad River Power Company under the deed from Columbia Railway Company was set up on the books of the Power Company at the same figures as those carried on the books of the Railway Company, which was about ten and one-half million dollars. The evidence shows that independent engineers had made a report as to the value of the property, and that they valued the physical property of Columbia Railway Company on the basis of *reproduction* as of May 31, 1924, at $12,227,000.00, of which $2,250,000.00 represented the railway department. Mr. R. D. Jennison, Vice-President, estimated the reproduction cost of the railway system as of July 31, 1925, at $1,750,000.00 and salvage value at $100,000.00.

"As a part of the transaction under which the conveyance was made, Broad River Power Company assumed the outstanding obligations of the Railway Company except those arising from and in connection with the street railway property. The evidence also shows that Broad River Power Company did in fact assume the payment of the *entire* outstanding bonded indebtedness of the Railway Company. This is shown by the parol testimony, and it is so stated in the schedules filed in the bankruptcy proceedings; although the resolution of the stockholders (Exhibit 4-42) under which the deed was made appears to *except* from the assumption of indebtedness not only the debts arising from and in connection with the street railway property, but also the payment of the bonded indebtedness mentioned in the resolution which it seems was in excess of $3,000.00. It is, therefore, concluded that notwithstanding the stipulation in the resolution, the bonded indebtedness was actually assumed. According to the testimony of Mr. J. P. Campbell, the Treasurer of both companies, the difference between the value of the property received and the obligations assumed by the Broad River Power Company was $3,682,394.00, *eliminating the stock agreed to be surrendered.* After the conveyance the common stock of the Railway Company was reduced from 20,000 shares to 217 shares, all of which was and is owned by the Broad River Power Company; and the preferred stock was reduced by 8,520 shares to 433 shares, of which Broad River Power Company owns 324 shares. The remaining 109 shares of preferred stock are in the hands of the public, but $100.00 per share was deposited by Broad River Power Company in a bank in New York City to take care of this outstanding preferred stock.

"Since the conveyance of June 15, 1925, the same persons have been executive officers of both the Broad River Power Company and the Columbia Railway Company (or at least this is substantially the case), and the directors have been largely the same. The returns filed as required by law for the

years 1925 and 1926 show that the same persons were President, Secretary, Treasurer, Superintendent and General Manager, respectively, of both companies. The evidence further shows that so far as the corporate management is concerned the railway business was carried on after the conveyance almost exactly as it had been prior thereto. Before the conveyance the railway business was done as a department of the general business of the company, and the books were so kept. After the conveyance, to all intents and purposes, the business was carried on as a department of the general business conducted by the Broad River Power Company, with the possible exception of the formal exchange of certain checks; that is to say, there were checks drawn by the Railway Company to the Power Company for the power used in the operation of the street car system, and the Power Company issued a number of checks to the Railway Company to assist it in its operations, the same amounting in the aggregate to $115,000.00 or thereabouts. In connection with the latter checks the evidence shows that they were merely charged up as an indebtedness of the Railway Company and were not represented by notes or other obligations.

"After the conveyance the *current* liabilities of the Railway Company exceeded its *current* assets by the sum of $24,078.56. This, of course, does not take into account the value of the railway property itself. The testimony of respondents is to the effect that the Railway Company was left in a solvent condition, but that it was not able to run without assistance, and that the assistance rendered was such as would naturally be given by a parent corporation to its subsidiary. The Railway Company later filed its petition in bankruptcy, alleging insolvency."

Under the title, "Conclusions of Law," in making further reference to the question, the referee makes this statement:

"The case has thus far been discussed as if one company owned all the franchises and property and no conveyance had been made; and the referee is of the opinion that what-

ever may be the judgment of the Court upon the merits the cause should be so treated. The merger or enabling Act does not require extended consideration. It authorizes a merger or a sale, and the sale might be in whole or in part; but the act, of course, contemplated a real sale and not a mere formal one. Under the admitted facts and circumstances of the case the transaction between Columbia Railway, Gas & Electric Company and Broad River Power Company was, so far as this proceeding is concerned, tantamount to a merger of the former into the latter, although nominally the Railway Company retained the street railway property and its corporate existence.

"It is true that mere ownership of the capital stock of one corporation by another does not create an identity of corporate interest between the two companies, or render the holding company the owner of the property of the other, or create the relation of principal and agent, or representative, or *alter ego* between the two; but it is equally true that when the facts show not only stock ownership, common officers and the like, but that the subsidiary company was a mere agency or department of the holding company, or that it was an instrumentality to subserve some special purpose of the holding company, particularly where the public interests are involved, the Court will deal with the substance of the transaction as if separate corporate entities did not exist. *United States v. Lehigh Valley R. Co.,* 220 U. S., 257, 31 S. Ct., 387, 55 L. Ed., 458; *United States v. Delaware, L. & W. R. Co.,* 238 U. S., 516, 35 S. Ct., 873, 59 L. Ed., 1438; *Chicago, M. & St. P. R. Co. v. Minneapolis C. & C. Association,* 247 U. S., 490, 38 S. Ct., 553, 62 L. Ed., 1229."

We are in full accord with the views expressed by the referee on this question, that the two corporate respondents should be treated as one corporation, and think the same amply supported by the record of the case, but as stated at the outset, we do not agree with the referee

in holding that the petitions of the petitioners should be dismissed.

Adopting the view of the referee in holding that the two corporate respondents, Broad River Power Company and Columbia Railway, Gas & Electric Company, under the facts of this case, must be treated as one corporation, let us now consider the other questions involved.

It is not disputed by the respondents that the business conducted by the company, with the exception of that of the street railway, has been profitable, but respondents contend that on account of losses sustained on that business the company had the right to abandon the street railway. The petitioners deny this alleged right to the respondents, and contend that under Acts of 1891, granting the franchise for the combined public service operations of respondents, the electric street railway service is inseparably linked with the electric light and power (and gas) services, and may not be separately abandoned; that the city ordinance granting the right to operate and requiring daily operation under direction of council, constitute a contract absolutely binding the companies to operate at least for the fifty-year term of the franchise; that the contracts with the development companies providing for operation of the system are valid, subsisting and enforceable in this proceeding; and that the electric street railway system, as was found by the Railroad Commission, need not be operated at a loss, but can be made to yield a fair return.

As set forth in the report of the referee, the Columbia Street Railway Company was incorporated by an Act of the Legislature, passed in 1882; the Congaree Gas & Electric Company was incorporated by Act of the Legislature, passed in 1887; and in 1890 the Columbia Electric Street & Suburban Railway & Electric Power Company was incorporated by Act of the Legislature. In 1891, by Act of the Legislature (see Acts 1891, page 1453), the Columbia Electric Street & Suburban Railway & Electric Power Com-

pany was consolidated with the Congaree Gas & Electric Company, under the name of the Columbia Electric Street Railway, Light & Power Company. This Act of the Legislature authorizing the consolidation of the said two companies, and thereby creating the Columbia Electric Street Railway, Light and Power Company, not only created a corporation, but conferred a franchise and the right to do all of the things set forth therein. Under this Act the Columbia Electric Street Railway, Light & Power Company was given the franchise to commence, carry on and continue for a period of fifty years, the electric street railway, light and power services, which are public services. As contended by the petitioners, the powers and privileges held by this new corporation were derived from this Act of incorporation, and were not the mere continuation of the powers formerly granted to the consolidating corporations. "It was the creation *de novo* of a new corporation with new powers and privileges." 12 R. C. L., 220; 7 R. C. L., 170; *Atlantic & Gulf R. R. Co., v. State of Georgia,* 98 U. S., 359, 25 L. Ed., 185; *Rochester R. R. v. City of Rochester,* 205 U. S., 236, 27 S. Ct., 469, 51 L. Ed., 784; *R. R. Company v. Gibbes,* 27 S. C., 385, 4 S. E., 49.

So much of the Act (1891) under consideration pertinent to the questions involved is, in effect, as follows:

"Sec. 2. That upon such consolidation 'The Columbia Electric Street Railway, Light and Power Company' shall be vested with all the rights, franchises, powers and privileges conferred upon the consolidating companies by an Act entitled 'An Act to incorporate the Congaree Gas and Electric Company,' *i. e.* (Act Dec. 16, 1891 [20 St. at Large, page 1453, § 2].)

"Sec. 2. The said corporation shall have full power and authority to manufacture, make and sell gas, * * * and to furnish such quantities of gas as may be required in or near the City of Columbia, * * * and * * * to carry on and conduct the business of using electricity for any purpose

* * * within the said State and to the inhabitants thereof, * * * of the several cities, towns and villages thereof * * * and for such purposes to erect or lay all necessary poles, pipes and conductors, subject to proper municipal ordinance and restriction, and the supplying of power * * * and the said corporation shall have full power and authority to erect shops, works and such other buildings as may be necessary or desirable. * * *" (Act Dec. 24, 1887 [19 St. at Large, page 1103, § 2]).

And by an Act entitled "An Act to Incorporate the Columbia Electric Street and Suburban Railway and Electric Power Company," *i. e.*:

"Sec. 5. That the said company shall have power to construct or acquire single or double railway tracks, * * * through any street or streets of the City of Columbia, with consent of City Council, and to extend the same five miles into the country, * * * from the State Capitol. And the said company is authorized and empowered to contract for and provide electric motor power for any other purpose or purposes.

"Sec. 6. That said company shall have power to operate their cars in the transportation of passengers and freight over the tracks they may construct or acquire in said city, with electric power, in suitable carriages, and at such rates as may be fixed upon in the by-laws of the same. (Act Dec. 24, 1890 [20 St. at Large, page 969, §§ 5, 6].)

" * * * and that said consolidated company be authorized and empowered to purchase and acquire the property, franchises and privileges of 'The Columbia Street Railway Company,' and upon such purchase said consolidated company be vested with all the rights, powers, franchises and privileges conferred by an Act entitled 'An Act to Incorporate the Columbia Street Railway Company," *i. e.* (Act Dec. 16, 1891 [20 St. at Large, page 1453, § 2].)

"Sec. 5. That the said company shall have power to construct single or double railway tracks * * * through any

street or streets of the City of Columbia, * * * and to extend the same five miles beyond the corporate limits of said city: *Provided,* That the said company shall so construct said railways that they shall not obstruct the streets through which they pass, and that the company shall be required, after laying said railways, to replace the portion of the streets over which they pass in good condition, and thereafter keep their railway in like good order; in consideration of which the said company shall have such exclusive right-of-way over said railway as may be necessary for the proper conduct of its business.

"Sec. 6. That said company shall have power to transport passengers and freight in suitable and sufficient carriages and cars, at such rates as may be fixed in the by-laws of the same." (Act Feb. 9, 1882 [17 St. at Large, page 876, §§ 5, 6].)

"Sec. 6. That the duration of the charter hereby granted shall be for the term of fifty years, and until the final adjournment of the General Assembly next thereafter." (Act Dec. 16, 1891 [20 St. at Large, page 1453, § 6].)

See *Interstate Consol. Street R. Co., v. Massachusetts,* 207 U. S., 79, 28 S. Ct., 26, 52 L. Ed., 111, 12 Ann. Cas., 555.

It is shown from the record that pursuant to special meeting of the stockholders of the consolidating corporations, duly called and held January 6, 1892, the State charter was duly and regularly accepted, and this company has continuously operated under said charter, and engaged in, conducted and carried on the combined public services authorized under said State charter from that date to the time when the electric railway service was abandoned in March, 1927. It is further shown from the record that the business of the consolidated company has been very successful. It increased its capital stock from time to time from $75,000.00 to $3,000,-000.00 in the year 1911 (at which time its name was changed to Columbia Railway, Gas & Electric Company),

and during each year the earnings of the company have been sufficient to warrant the payment of a good dividend to the stockholders each year. As pointed out by the petitioners, and sustained by the record, the balance available, after the payment of operating and maintenance expenses, taxes and interest, for the years 1920, 1921, 1922, 1923 and 1924 for the Columbia Railway Gas & Electric Company, and the dividends actually paid and surplus set aside by the Broad River Power Company in 1925-1926 were as follows:

| | |
|---|---:|
| 1920 | $ 121,159.16 |
| 1921 | 236,028.36 |
| 1922 | 215,072.00 |
| 1923 | 364,403.00 |
| 1924 (June 30th) | 418,751.00 |
| 1925 Dividends (Common and Preferred) | 334,545.00 |
| 1926 Dividends (Common and Preferred) | 349,682.00 |
| Surplus | 627,402.59 |
| Total | $2,667,043.11 |

After looking into the record, we are of the opinion that the referee was in error in reaching the conclusion that the company during this period sustained "devastating losses" of "appalling magnitude."

In 1911 the name of the Columbia Electric Street Railway, Light & Power Company was changed to Columbia Railway, Gas & Electric Company, and its capital stock increased (to which reference has already been made) by amendment of the charter granted by the Secretary of State under the general law; and on September 5, 1912, the charter was amended further under the general law, so as to continue in force in perpetuity, as recited in report of the referee.

The company having received its *primary franchise* for the operation of all these public services under a a grant from the State, we agree with the position of the petitioners that the companies now before this Court, and

for the purposes of this case must be considered as one company, in the interest of the public and the parties to this cause, cannot be allowed to abandon the electric railway service on account of the alleged losses on the electric railway department alone. According to our view the electric railway business is inseparable from the light and power business. In this connection, we call attention to the case of *Spartanburg v. S. C. Gas & Electric Company,* 130 S. C., 125, 125 S. E., 295, which to our minds decides this question. By reference to that case it will be noted that the language granting the franchise is in meaning as permissive as the language granting the franchise in the case at bar, and the principle declared in that case, controls in this case. In support of this position attention is also called to the following authorities: *Fort Smith Light & T. Co. v. Bourland,* 267 U. S., 330, 45 S. Ct., 249, 69 L. Ed., 631; *Milwaukee Co. v. State of Wisconsin,* 252 U. S., 100, 40 S. Ct., 306, 64 L. Ed., 476, 10 A. L. R.; 892; *Chesapeake & O. R. Co. v. Public Service Com.,* 242 U. S., 603, 37 S. Ct., 234, 61 L. Ed., 520; *Missouri P. R. Co. v. Kansas,* 216 U. S., 262, 30 S. Ct., 330, 336, 54 L. Ed., 472; *Atlantic Coast Line R. R. Co. v. N. C. Corporation Commission,* 206 U. S., 1, 27 S. Ct., 585, 593, 51 L. Ed., 933, 11 Ann. Cas., 398.

As contended by petitioners, a public service corporation must perform all the services authorized by its charter as long as it retains any of the benefits of the charter granted by the State; and the obligation must be determined by the productiveness of the corporation as a whole. In this connection special attention is directed to the case of *Atlantic Coast Line R. R. v. N. C. Corporation Commission, supra,* as being in support of this well-recognized rule. In that case, "The company was ordered to put on and maintain a train so as to make connection with the Southern Railway Company at Selma, notwithstanding it was conceded that the operation of such connecting train in itself would necessitate a daily loss to the company. The authority

to make such an order was upheld on account of the public nature of the company's business and the resulting power of the State to regulate such business." The Court said in that case, "That power, as we have seen, takes its origin from *the quasi public nature* of the business in which the carrier is engaged, and embraces that business in its entirety," and stated further: "As the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so, as an incident, some pecuniary loss from rendering such service may result. * * * As the duty to furnish necessary facilities is co-terminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and *productiveness of the corporate business as a whole,* the character of the services required, and the public need for its performance. * * * "

In the case of *Missouri P. R. Co. v. Kansas, supra,* in passing upon a like question the Court used this language: "* * * But where a duty which a corporation is obliged to render is a necessary consequence of the acceptance and continued enjoyment of its corporate rights, those rights not having been surrendered by the corporation, other considerations are, in the nature of things, paramount; since it cannot be said that an order compelling the performance of such a duty at a pecuniary loss is unreasonable. To conclude to the contrary would be but to declare that a corporate charter was purely unilateral; that is, was binding in favor of the corporation as to all rights conferred upon it and **was** devoid of all obligation as to duties imposed, even although such duties were the absolute correlative of the rights conferred."

The same principle was adhered to in the recent case of *Fort Smith Light & Traction Company v. Bourland,* 267 U. S., 330, 45 S. Ct., 249, 250, 69 L. Ed., *31. While the Court in that case recognized the right of the company to surrender its franchise and avoid operating its entire system at a

loss, it made this statement: "But the Constitution does not confer upon the company the right to continue to enjoy the franchise [or indeterminate permit] and escape from the burdens incident to its use."

As is well contended by petitioners, a public service corporation may be required to perform its charter functions even though by so doing a loss on the particular branch of service may be entailed. The criterion is the entire public business of the company. It being established that the electric railway service is inseparably linked with the electric light and power services, it is apparent that under these cases the company may be required to carry on the electric railway service as long as it retains the electric light and power priviliges. Whether the electric railway business be considered an *adjunct* of the light and power business, or whether the electric light and power business be considered an *adjunct* of the electric railway business, they are all parts of one public business, conducted under one franchise.

In addition to the authorities above cited, attention is also called to the following cases: *Brownell et al. v. Old Colony R. R. Co.,* 164 Mass., 29, 41 N. E., 107, 29 L. R. A., 169, 49 Am. St. Rep., 442; *Gibbs v. Consolidated Gas Company,* 130 U. S., 396, 9 S. Ct., 553, 32 L. Ed., 985; *Attorney General ex rel. Corporation Commissioner v. Haverhill Gas Light Co.* 215 Mass., 394 , 101 N. E., 1061, Ann. Cas., 1914C, page 1266; *New Orleans Gas Light Co. v. Louisiana Light Mfg. Co.,* 115 U. S., 650, 6 S. Ct., 252, 29 L. Ed., 516; *Harmon v. Columbia & Greenville R. Co.,* 28 S. C., 401, 5 S. E., 835, 13 Am. St. Rep., 686; *Braham v. Southern Express Co. et al.,* 124 S. C., 157, 117 S. E., 368.

The nature of the corporate charter, the franchise and the operation show an inseparability of services, and the acceptance of the charter constitutes a contract between the State and the corporation. See, also, *Trustees of Dartmouth College v. Woodward,* 4 Wheat, 518, 4 L. Ed., 629.

Also, the principle is thus stated in *Corpus Juris:* "When a special act of incorporation has been accepted according to its terms, all conditions precedent being performed so as to render the acceptance valid and sufficient, the corporation comes into existence, and a binding contract between the State on the one hand and the incorporators and corporation on the other results, so that all the rights, duties and liabilities expressed or implied in the Act attach, and cannot thereafter be withdrawn or impaired by the State in violation of the grant or cast off by the incorporators or the corporation without the consent of the State. * * *" 14 C. J., 110.

There being a contract between the State and the company, this contract must be carried out by the company, the company must perform all of the services contemplated by the contract, and, further, the contract must be treated as an entirety. This principle must not be overlooked.

It is the contention of the petitioners that a franchise is the privilege of doing that "which does not belong to citizens of the country generally by common right," and that such franchises are granted primarily for the public benefit, and when accepted constitute a contract, and that the grantee undertakes in consideration for the privilege granted, to perform the services authorized. This position, in my opinion, is well supported by authority and cannot be successfully questioned. See 12 R. C. L., 174-175; *People's Pass. R. Co. v. Memphis City R. Co.,* 10 Wall., 38, 19 L. Ed., 844; *New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Mfg. Co.,* 115 U. S., 650, 6 S. Ct., 252, 29 L. Ed., 516; 12 R. C. L., 179-180; 26 C. J., 1014; 12 R. C. L., 199-200; *McCandless v. R. R. Co.,* 38 S. C., 103, 16 S. E., 429, 18 L. R. A., 440; 26 C. J., 1030; *Brownell et al. v. Old Colony R. R. Co.,* 164 Mass., 29, 41 N. E., 107, 29 L. R. A., 169, 49 Am. St. Rep., 442.

Therefore, the company cannot be permitted to abandon the electric railway service while retaining the electric light and power privileges.

Furthermore, the electric railway service is connected with the electric light and power business and is inseparable from it by reason of the manner of construction and operation, as well as by the charter and franchise contract. It appears from the record that during the thirty-six years the company has operated the company has erected power plants for the generation of electricity to be used for operating the railway system and to be sold for light and power. It has erected poles on the rights-of-way it has acquired, and hung wires on the poles to be used for the purpose of the transmission of such electric power for the operation of the railway and for sale to the public for lighting purposes, and for power to be used for other purposes. The company has also erected a substation used for the conversion of power for any and all purposes, built administrative offices, and has done other work and acquired the greater part of its property for the joint use of the electric railway service and the electric light and power service.

It also appears from the record in the case that when the company constructed or acquired its suburban electric railway lines, "the very same poles in every case which were used for carrying current to operate the railway were also used to carry the current for sale as electric light and power to the communities served by such electric railway."

Thus, these lines particularly were constructed and acquired directly under the company's primary franchise from the State for the operation of the electric street railway, light and power business. "Thus, for nearly forty years these phases of this business have gone hand in hand; they have grown and developed from their infancy in 1891 to their present maturity; they are as inseparable as parts of the human body and cannot now be operated independently." This contention is substantiated by the record in the case. It also appears from the evidence in the case that during all of this period of combined operation the returns from the railway have been used for the development of the company's

general property, gone into a common fund, and been used and expended for general corporate purposes. The patrons of the railway service have therefore contributed to the general upbuilding of the property and system which the company now desires to use entirely for the electric light and power and gas business. To permit this would mean the destruction of the electric railway service, for the railway service cannot be carried on in the community in question without the use of the property which is now being used and operated for electric light and power purposes. It further appears from the record in the case that the company is now using for its electric light and power purposes the power plants, substations, poles, rights-of-way and car barns constructed or acquired under its franchise for electric railway purposes, and that this property now being retained and used for electric light and power property comprises the most vital parts of the electric railway system.

We agree with the position of petitioners that the effect of Act of 1891, creating the Columbia Street Railway, Light and Power Company, was to confer upon one corporation the consolidated public utility privileges for this community, gas and electric, including electric railway, electric light and electric power; that it was a consolidated grant of electric privileges, street railway, light and power inseparably linked; and that the object in view was that the public might be better served with these utilities. We also agree with the position of petitioners that whatever may have been the case before acceptance, when the corporation accepted these consolidated privileges, and acted upon them and built its power plants, substations, electric lines, poles and other electric railway facilities, all as parts of one electric business, it cannot now be permitted to separate the electric railway from the electric light and power phases of business.

In our opinion the cases relied on by the referee—*Railroad Commission v. Eastern Texas R. R. Co.,* 264 U. S., 79, 44 S. Ct., 247, 68 L. Ed., 569; and *Brooks-Scanlon Co.*

*v. Railroad Commission,* 251 U. S., 396, 40 S. Ct., 183, 184, 64 L. Ed., 323, are not applicable to the questions before this Court. Each of the companies in those cases had been organized principally to conduct a lumber business, and the railroad business conducted was merely incidental, and the lumber business having been completed, the Court held that the company could not justly be compelled to carry on the railroad business at a loss. According to our opinion these cases do not support the referee's position. In the last-mentioned case, *Brooks-Scanlon Co. v. Railroad Commission,* the Court by the use of the following language, upheld the position the petitioners in the case at bar are contending for: "It is true that if a railroad continues to exercise the power conferred upon it by a *charter from a State,* the State may require it to fulfill an obligation imposed by the charter even though fulfillment in that particular may cause a loss," citing *Missouri P. R. Co. v. Kansas,* 216 U. S., 262, 276, 278, 30 S. Ct., 330, 54 L. Ed., 472, 478, 479.

The case of *Bullock v. State of Florida,* 254 U. S., 513, 41 S. Ct., 193, 65 L. Ed., 380, cited by the referee as being in support of the position taken by him, also involved a logging road, and the question decided does not throw any light on the questions now before this Court, as we view the case. Neither do we think the other cases relied on by the referee and the respondents controlling in the case at bar.

Even if the case should be decided upon the theory that the company was merely operating under a "permissive franchise or indeterminate permit," as contended by the respondents (which we do not concede), the corporate respondents could not escape the responsibility of operating the street cars. In this connection, see the case of *Fort Smith Light & Traction Company v. Bourland, supra,* 267 U. S., 330, 45 S. Ct., 249, 250, 69 L. Ed., 631. In this case the Court discusses the question under the theory of "direct contractual obligation" and also under the theory of a "permissive franchise," and under both theories reaches the

conclusion that the light and traction company should not be permitted to escape the obligation it was under to operate the street cars on a certain line, even though the operation entailed a heavy loss. To operate the line in question in that case necessitated relaying the tracks thereon at a cost of $11,000.00; the allocated daily earnings of this small part of the system were $2.40, the cost of operating $8.25, and the total net earnings of the system in the year 1922 (the year prior to commencement of the suit) were $16,000.-00, which amount, as stated by the Court, is about 1.7 per cent. of $934,540.00, the estimated value of the property. The decision of the Courts of the State of Arkansas (160 Ark., 1, 254 S. W., 481), in upholding an order refusing to permit the company to abandon the line of street railway in question, was affirmed. In the opinion of the Court, delivered by Mr. Justice Brandeis, it is stated that "it [the Fort Smith Light & Traction Company] cannot, in the absence of contract, be compelled to continue to operate its system at a loss," recognizing, of course, the right of the company in the absence of a contract, to abandon its franchise and cease business altogether. But Mr. Justice Brandeis adds these words: "But the Constitution does not confer upon the company the right to continue to enjoy the franchise [or indeterminate permit] and escape from the burdens incident to its use."

Whether the franchise is granted by ordinance of the city or by act of the Legislature, the principle is the same.

It is contended by petitioners, with which position we are in full accord, that when the horse and electric street railway franchise had been transferred to and become blended into Columbia Electric Street Railway, Light & Power Company, the name being later changed to Columbia Railway, Gas & Electric Company, neither the said company nor any of its successors can have the benefits of any of the franchises granted without performing the electric street railway service. In this connection, see the case of

*Brownell et al. v. Old Colony R. R. Co.,* 164 Mass., 29, 41
N. E., 107, 108, 29 L. R. A., 169, 49 Am. St. Rep., 442,
cited above. In that case a corporation was granted a fran-
chise for the purpose of operating a ferry, and later was
authorized to transfer its charter with all of its rights and
powers to the Fairhaven Branch Railroad Company. Follow-
ing this transaction the railroad company operated the ferry
in connection with and seemingly as a part of its railroad
line for some time. In this connection "it was the same in
effect as if the railroad company by its original charter had
been authorized to establish and operate the ferry as a part
of its line." Later the defendant in that case, Old Colony
Railroad Company, succeeded to all the rights of the Fair-
haven Branch Railroad Company. Soon thereafter the Old
Colony Railroad Company, defendant in the case, abandoned
the "ferry" branch of its franchise, assigning as a reason for
such abandonment that that branch of its business was not
profitable and could be maintained only at a heavy loss. The
Court required the Old Colony Railroad Company to rein-
state and operate the ferry upon the principle that the ferry
franchise had become *blended* with the railroad franchise
and that it was incumbent upon the company to perform all
of the purposes of the *blended franchise;* the Court saying:
"Its franchises are granted for the public good, and in exer-
cising them it is largely subject to the control and direction
of the Legislature. Either by virtue of the police power or
of the reserved power to alter charters, many acts may be
required which involve expanse, and which a railroad corpo-
ration, or other corporation to which like rules would apply,
would not, if left to itself, undertake. Numerous illustra-
tions of this are found in the decisions of this Court, as well
as in those elsewhere" (citing many cases).

The Court further stated:

"The defendant further contends that the only liability of
the defendant for failure to operate the ferry is a liability
to forfeit the ferry charter. This argument cannot prevail,

since the *blending* of the ferry franchise with that of the railroad company. * * *

"The effect of the transaction was to transfer the duties from one corporation to another, after which the original corporation had no further interest in the matter; but the railroad company was bound by law to perform all and singular the duties of the ferry company."

The statement of facts in this case are analagous to those involved in the case at bar, and the principles announced in that case should have a direct bearing on the decision of the case at bar. Attention is also called to the following cases: *Gibbs v. Consolidated Gas Co.*, 130 U. S., 396, 9 S. Ct., 553, 32 L. Ed., 979; *Attorney General ex rel. Corporation Commissioner v. Haverhill Gas Light Co.*, 215 Mass., 394, 101 N. E., 1061, Ann. Cas., 1914-C, 1266; *New Orleans Gas Light Co. v. Louisiana Light, etc., Mfg. Co.*, 115 U. S., 650, 6 S. Ct., 252, 29 L. Ed., 516; *Harmon v. Columbia & Greenville R. R. Co.*, 28 S. C., 401, 5 S. E., 835, 13 Am. St. Rep., 686; *Brabham v. Southern Express Co. et al.*, 124 S. C., 158, 117 S. E., 368; *Spartanburg v. S. C. Gas & Electric Co., supra*, 130 S. C., 126, 125 S. E., 295.

As to the position of the referee in holding that "the ██ manifest purpose of the consolidating Act (Act of 1891) was to give the new company *permission* * * * to exercise the *several* franchises or any of them upon complying with their *respective* conditions, which shows their independence," we are not in accord with this view; but on the other hand we agree with the position of the petitioners that the manifest purpose of the Act was to provide for a consolidation in order that the public might as a result be better served. By reference to the Act it will be seen that the Act itself recites the fact that the consolidating companies had "agreed to consolidate the property, franchises and privileges owned * * * by them," and the Act authorized the companies to "consolidate their property, franchises and privileges into *one* company"; and further provided that

upon such consolidation the new company should "be vested with all their rights, franchises, powers and privileges." Therefore, when the new company in compliance with this Act effected the consolidation, and in pursuance of the provisions of the Act built, constructed and operated "its electric railway, light and power properties, as parts of one business for nearly forty years," these rights, powers and privileges became inseparably bound together and cannot be separated. As contended by the petitioners, "such diversity as there was in the conditions of the former franchises became obliterated and extinguished by the major purpose of the new Act, namely, the *consolidation* of all the powers into one company for *the greater benefit* of the public." According to our view the Court should hold, under the facts in the case, that there is an interdependence between the electric railway and the electric light and power business in the case at bar, as was held in the *Spartanburg case, supra,* 130 S. C., 125, 125 S. E., 259. It is true, as stated in one of the cases cited by the referee as sustaining his position, *Illinois Trust & Savings Bank v. Doud* (C. C. A.), 105 F., 123, 52 L. R. A., 481, "that before any of the privileges are exercised, the franchise cannot be forfeited for failure to exercise any particular one of the rights granted"; but the situation is very different when all the privileges granted, as in the case at bar, have been exercised and "public business thereby inaugurated which is dependent upon the continued joint operation of the privileges." Even in these cases to which the referee calls attention, above mentioned, it is stated that "where the powers are inseparably connected with each other," the corporation may be required to exercise all its corporated powers as a condition of the exercise of the others. In this connection, see the following cases cited herein: *Fort Smith Light & Traction Co. v. Bourland,* 267 U. S., 330, 45 S. Ct., 249, 69 L. Ed., 631; *Chesapeake & O. R. Co. v. Public Service Commission,* 242 U. S., 603, 37 S. Ct., 234, 61 L. Ed., 520; *Missouri P. R. Co. v. State of Kansas,*

216 U. S., 262, 30 S. Ct., 330, 54 L. Ed., 472; *Atlantic Coast Line R. Co. v. North Carolina Corporation Commission,* 206 U. S., 1, 27 S. Ct., 585, 51 L. Ed., 933, 11 Ann. Cas., 398; *Brownell et al. v. Old Colony R. R. Co.,* 164 Mass., 29, 41 N. E., 107, 29 L. R. A., 169, 49 Am. St. Rep., 442.

Franchises must be construed in favor of and for the benefit of the public and against the party to whom the franchise is granted. In 26 C. J., 1031-1033, the principle is stated thus:

"Grants of franchises are strictly construed in favor of the public. * * *

"Where a grant is susceptible of two meanings, one restricting and the other extending the powers under a franchise, that construction is to be adopted which works the least harm to the State." In the case of *Blair v. Chicago,* 201 U. S., 400, 26 S. Ct., 427, 50 L. Ed., 801, the Court approved this statement of the rule as "sound doctrine, and should be vigilantly observed and inforced."

This principle should be applied in the case at bar, and therefore the conclusion that the charter and franchise in question and operations thereunder must be construed as having authorized the exercise of the electric light and power privileges only upon condition that the electric railway service be furnished is inescapable.

In the report of the referee it is suggested that it would not be conducive to the public interest to require the patrons of the light and power utility to contribute to the maintenance of the electric railway; the suggestion being based, it appears, upon the assumption that the electric railway service is an entirely different public utility from the electric light and power utility, which assumption is erroneous. As has already been pointed out, the Act of 1891 consolidating the franchise, created one public utility company, the Columbia Electric Street Railway, Light and Power Company. Since the passage of that Act

there has been but one public utility in the City of Columbia community, and from that time there was no longer a street railway company, but, as contended by petitioners, an electric street railway, light and power company, and from that time to the present "the patrons of the electric railway have contributed to the electric light and power, and *vice versa.*" This conclusion is well supported by the record in the case. Whether the power plants, substations, poles, rights-of-way, other property and facilities going to make up the electric railway, light and power system were built or constructed more from the contributions of the patrons of the electric street railway or from the patrons of the electric light and power, it is impossible to ascertain. The entire plant or system is necessary for the operation of both, the electric street railway and light and power. In this connection, see the case of *Chesapeake & Ohio Ry. Co. v. Public Service Commission,* 242 U. S., 603, 37 S. Ct., 234, 236, 61 L. Ed., 520. As was stated by the Court in that case, which is applicable to the case at bar: "An obligation to use it for both was imposed by law and so could not be thrown off or extinguished by any act or omission of the railway company." In addition to the case above cited, we call attention at this time to the cases of *Spartanburg v. S. C. Gas & Electric Co., supra,* 130 S. C., 126, 125 S. E., 295; *Fort Smith Light & Power Co. v. Bourland, supra,* 267 U. S., 330, 45 S. Ct., 249, 69 L. Ed., 631.

The position of the respondents that there was a ▪ valid separation under the merger Act (Acts of 1925, page 842) of the electric railway from the electric light and power property is sufficiently answered in the report of the referee, which is adverse to respondents' contention. In our opinion the merger Act was not intended to permit and did not authorize a separation of the electric railway from the light and power property.

A study of the record does not show any ground for ▪ the contention that the Act was a part of the canal settlement, and in our opinion respondents' conten-

tion in this respect is entirely without support. Furthermore, the merger Act itself does not purport to authorize any merger or transfer which could possibly be construed to mean that the transferee company should in any sense be released from the electric railway obligations of the Columbia Railway, Gas & Electric Company. The Act provides that the merger, consolidation or sale authorized by the Act should be "made without prejudice to * * * any rights of any creditors of the companies so selling," and also that the company to which the franchises were authorized to be made "shall hold the same with all the rights, powers and privileges granted to the original holder thereof, *subject only to the restrictions, requirements and conditions in said franchises contained.*" It is clear that the merger Act (Acts 1925, page 842) was intended, and should be construed to mean, to authorize a merger or transfer without in any sense releasing the company "receiving such franchises and property from the obligations of the transferring or merging company," and in our opinion furnishes no justification or authority for the separation of the railway department from that of the electric light and power property and the discontinuance of the electric railway service. If such was the purpose and intention of the respondents when the Act was passed, it is not disclosed by the wording of the Act, is not authorized by the Act, and should not be permitted by the Courts. If it be contended that the Act is not clear; that there is an ambiguity in the language used, then, following the well-recognized rule, such ambiguity should be resolved in favor of the public and against the company.

Furthermore, the facts in the case, as disclosed by the record, show that there has been no valid legal separation, but a merger of the two companies. It clearly appears from the record in the case that the Broad River Power Company owned all of the common stock in the Columbia Railway, Gas & Electric Company, consisting of 20,000 shares, and also owned all of the 8,953 shares of the preferred stock in

said company, except 109 shares, for which it has deposited in a bank $100.00 per share. Petitioners contend that this deposit was made for the purpose of preventing criticism. This contention finds support in the record. The record also shows that when this transaction took place the Broad River Power Company retired all of the common stock with the exception of 217 shares and retired all of the preferred stock except 433 shares. Another incident which should have a bearing on the case is the fact that the companies had the same officers—the same president, vice- president, secretary, treasurer, assistant secretary, assistant treasurer, manager, auditor and bookkeeper. The record in the case also shows that the auditor of the two companies was paid for his services by the same check. The companies also, for the purpose of conducting the work, used the same trucks, in which the workmen were hauled to their place of work on the tracks and on the electric wires and electric lights.

Another important feature of the case to which we direct attention is the advertising matter gotten out by the Broad River Power Company, through its president, Mr. W. S. Barstow, in connection with the sale of bonds of the Broad River Power Company, published in the *Commercial and Financial Chronicle,* of New York City, dated November 15, 1924. Included in the matters contained therein we call attention to the following:

"The electric properties which the Broad River Power Company will control and operate include, in addition to the new steam plant, two hydro-electric power plants and a steam power plant. * * * The electric railway property consists of thirty miles of standard-guage trackage and sufficient equipment for operation.

"The Broad River Power Company, with its auxiliary companies, will continue to supply electric light and power, gas and electric railway service through the territory in and about Columbia, S. C.

"The company, Broad River Power Company, through subsidiaries, does without competition the entire electric light, power, gas and street railway business in Columbia, S. C., and environs.* * * "

There was also published in said *Commercial and Financial Chronicle,* in issue of July 11, 1925, relative to the sale of Broad River Power Company bonds by Pynchon & Company and other houses, the following:

"Broad River Power Company, organized in July, 1924, in South Carolina, *has acquired through merger* all the physical properties, franchises and other assets (except electric railway properties) of its former subsidiaries, Columbia Railway, Gas & Electric Company, Parr Shoals Power Company, and Columbia Gas Light Company. The electric railway property will continue as Columbia Railway, Gas & Electric Company, whose entire common stock is owned by Broad River Power Company."

In the transfer that took place the Columbia Railway, Gas & Electric Company executed a deed in which it undertook to transfer to the Broad River Power Company "all the electric light and power and gas properties, including power, plants, substations, car barns and poles, used exclusively for the electric railway service, reserving only the rails, cross-ties, guy wires and cars." It is to be noted that in this transaction no cash consideration at the time was paid, it being stated that the Broad River Power Company was to assume the obligations with reference to the alleged department transferred in the manner above set forth. The value of the property transferred in the manner aforesaid to the Broad River Power Company, according to the sworn statement of the auditor, Mr. King, was $11,406,430.00, against which the liabilities amounted to $7,053,211.88, so that the net value of this physical property, etc., so transferred, amounted to $4,353,511.55. In this connection we call attention to the following testimony of Mr. King, the auditor:

"Q. I am speaking of this—you gave me a figure of four million · some odd thousand dollars—what consideration passed for that equity of four million some odd thousand dollars, which was the value of the assets above the liabilities which you gave me, other than the cancellation of that stock? A. I can't say that there was any.

"Q. Can you say that there was any? A. I can't say that there was.

"Q. Do the books show any? A. Not to my knowledge.

"Q. You have examined the books? A. Yes, sir."

Mr. Campbell, treasurer of the company, in the course of his testimony stated that according to his figures the difference between the values of the property so transferred and the obligations assumed by the company was $3,682,394.00. Mr. Campbell further stated that the purpose and object of the alleged separation was to put the Broad River Power Company in a position to sell its bonds to better advantage, and that a part of the consideration for this transfer was the surrender of the stock in the Columbia Railway, Gas & Electric Company and the Parr Shoals Power Company.

Just here attention is called to the fact that after this alleged separation, the Columbia Railway, Gas & Electric Company was left with a deficiency of current assets. The current assets amounted to $75,145.00, and the current liabilities amounted to $99,224.48, leaving a net deficiency of $24,078.56. This placed the Columbia Railway, Gas & Electric Company in such position that it could not carry out the obligation to furnish the street railway service without getting assistance, as testified by the witness, Mr. Jennison, of the company. It is claimed by the Broad River Power Company that it furnished the needed amount for operating to the Columbia Railway, Gas & Electric Company. No note or other paper was taken from the Columbia Railway, Gas & Electric Company for any amount of money so furnished, but a charge was simply made on the books and no due date was stated. Mr. Costello, who was the auditor for both the

Broad River Power Company and the Columbia Railway, Gas & Electric Company, in the course of his testimony, testified to the following statement:

"Q. On February 28, 1927, the Broad River Power Company advanced the Columbia Railway, Gas & Electric Company to meet its deficit, $112,500.00; what security was that? A. No security.

"Q. When is it due? A. No due date.

"Q. Is that the way you do business? A. It so happens the Broad River Power Company owns the stock of the Columbia Railway, Gas & Electric Company.

"Q. Demand no security between themselves? A. The only thing they have is these balances between themselves."

In this connection it is well to note that during the hearing of the cause a voluntary petition in bankruptcy was filed by the Columbia Railway, Gas & Electric Company, the disposition of which petition is stated in the report of the referee. In its schedule, attached to said petition in bankruptcy, the Columbia Railway, Gas & Electric Company listed its total assets at $50, 444.09 and its total liabilities at $3,267,978.75. In the schedule it was stated that the bonds, amounting to $3,121,500.00, had been assumed by the Broad River Power Company. It was also set forth in the schedule attached to the petition in bankruptcy that "of the total unsecured claims, amounting to $123,204.02, the Broad River Power Company, or its allied interests, claimed $122,385.45."

All of these circumstances force us to the conclusion that there has been a merger of the two companies, Columbia Railway, Gas & Electric Company and the Broad River Power Company. In addition to the authorities already cited herein, we call attention to the following cases: *Brown v. Am. Ry. Express Co.,* 128 S. C., 428, 123 S. E., 97; *Davis v. Alexander,* 269 U. S., 114, 46 S. Ct., 34, 70 L. Ed., 186; *Huggins v. Com. Sav. Bank,* 141 S. C., 480, 140 S. E., 177; *Terry v. Sou. Express Co.,* 143 S. C., 1, 141 S. E., 144.

As conceded by petitioners, mere acquisition and control of stock in one corporation by another corporation does not necessarily for all purposes make the corporations the same, but where it appears that the transaction was such as to give the corporation acquiring and controlling the stock an opportunity to benefit or to injure the interest of the other, the Courts should grant relief when right and justice require it, as in the case at bar. We are convinced that the Columbia Railway, Gas & Electric Company, by means of the several transactions referred to herein, was converted into a mere agency or instrumentality of the Broad River Power Company for doing its bidding, and that the two corporations, for the purposes of this proceeding, should be considered, treated and dealt with as one. In support of this view special attention is called to the case of *Chicago, M. & St. P. Ry. Co. v. Minneapolis C. & C. Association,* 247 U. S., 490, 38 S. Ct., 553, 556, 62 L. Ed., 1229.

Mr. Justice Clarke, in delivering the opinion of the Court in that case, in discussing a similar question to the one now under consideration in the case at bar, made this statement: "With the facts thus summarized, it is difficult to conceive of a plan for the control of a jointly-owned company [two companies owned the company involved in this case] and for the operation of a jointly-owned track more complete than this is, and it is sheer sophistry to argue that, because it is technically a separate legal entity, the Eastern Company is an independent public carrier, free in the conduct of its business from the control of the two companies which own it and therefore free to impose separate carrying charges upon the public," and stated the rule thus: "In such a case the Courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

Applying these principles to the facts involved in the case at bar, that the Broad River Power Company got into its possession and control from the Columbia Railway, Gas & Electric Company $4,000,000.00 net worth of property, and also the franchise valued at $1,561,000.00, without paying any consideration for the same, and leaving the Columbia Railway, Gas & Electric Company in an insolvent and helpless condition, unable to function, the conclusion is inescapable that the corporations are merged, and further that the Broad River Power Company should be held liable to carry out the obligation of the Columbia Railway, Gas & Electric Company to furnish electric street railway service. *Terry Packing Company v. Southern Express Co.*, 143 S. C., 1, 141 S. E., 149, *supra; Huggins v. Com. Savings Bank*, 141 S. C., 380, 140 S. E., 177, *supra; Brabham v. So. Express Co.*, 124 S. C., 157, 117 S. E., 368, *supra; Chicago, M. & St. P. R. Co. v. Minneapolis*, 247 U. S., 490, 38 S. Ct., 553, 62 L. Ed., 1229; *American Ry. Express Co. v. Commonwealth of Ky.*, 273 U. S., 269, 47 S. Ct., 353, 71 L. Ed., 639; and other cases cited above.

As to the efforts of the Broad River Power Company to separate the electric railway from the electric light and power franchise, see also the case of *Old Colony Trust Co. v. Omaha*, 230 U. S., 100, 33 S. Ct., 967, 57 L. Ed., 1410.

An important position of the petitioners, and with which we agree, is that the City of Columbia having passed ordinances granting the right to operate, and the companies having agreed to the provisions of the same and commenced to operate thereunder and accepted the benefits to be derived therefrom, a binding contract was constituted, requiring operation. *Detroit v. Detroit Citizens' Street Ry. Co.*, 184 U. S., 387, 22 S. Ct., 410, 417, 46 L. Ed., 607. In that case the Court said:

"The original ordinance * * * was plainly a proposition on the part of the city to grant to the company the use of its streets * * * in consideration that the company

lay its tracks and operate a railway thereon upon certain conditions prescribed by the ordinance. This proposition, when accepted by the company and the road built and operated as specified, became a contract. * * *" *Detroit v. Detroit Street Ry. Co., supra; Spartanburg v. S. C., Gas & Electric Co.,* 130 S. C., 125, 125 S. E., 295, *supra.*

"A public utility cannot, because of loss, escape obligations voluntarily assumed. *Milwaukee Electric Ry. & Light Co. v. Wisconsin,* 252 U. S., 100, 105, 40 S. Ct., 306, 64 L. Ed., 476, 10 A. L. R., 892." *Fort Smith L. & Traction Co. v. Bourland,* 267 U. S., 330, 45 S. Ct., 249, 69 L. Ed., 631.

Under the principles stated in these cases, it is clear that the company involved in the case at bar is bound by contract with the City of Columbia to carry on the operations contemplated thereunder, including the operation of the street electric railway, against which alleged losses, if established, would afford no defense.

As to the facts on this phase of the case, the record shows that when the company was incorporated in 1891, with the right, in addition to other things, to operate an electric railway for a period of fifty years, with the consent of the city council of the City of Columbia, the company made written application to the council of said city, in 1892, asking for such consent, and actually submitted along with said application a proposed ordinance in accordance with the wishes and desires of the company. In October, 1892, the council of said city adopted an ordinance which authorized the company to lay its tracks, "to erect poles and hang feed wires thereon along such streets as may be most convenient." It also provided that cars should be operated on certain schedule, and prescribed a penalty for failure to comply with such provision; said ordinance provided for the same to be amended so that the council might regulate by ordinance the manner of operating the said cars, in such manner as the *public welfare demanded.* Under the authority of this ordi-

nance, the company placed its railway tracks, erected poles, and hung feed wires thereon and commenced the operation of the street railway system. A number of times, from 1895 to 1921, the company filed petitions to lay additional tracks. The petitions were granted by the passage of an ordinance in each instance, and in the ordinances so passed this provision was written: "The privileges are upon the express condition that the said company comply with all the rules, regulations and ordinances of the City * * * now of force or hereafter to be enacted relating to the construction of street railways and the operation of the same." It was under these ordinances that the company laid their tracks and erected poles for said purpose in the said city, and, as contended by petitioners, the said ordinances "constituted a special supplemental contract with the City of Columbia, and amounted to the grant of a secondary franchise for the operation of the electric railway system in the City of Columbia."

The authorities are practically agreed that city ordinances which grant the right to a street railway company, or any similar public utility to use the streets, constitute a contract. See the following authorities: *Henderson Water Company v. Corporation Commission of North Carolina et al.,* 269 U. S., 282, 46 S. Ct., 112, 70 L. Ed., 273; *Fort Smith Light & T. Co. v. Bourland,* 267 U. S., 330, 45 S. Ct., 249, 69 L. Ed., 631; *St. Cloud Public Service Co. v. City of St. Cloud,* 265 U. S., 352, 44 S. Ct., 492, 68 L. Ed., 1050; *Paducah v. Paducah Railway Co.,* 261 U. S., 267, 43 S. Ct., 335, 67 L. Ed., 647; *Georgia Railway & Power Co. v. Town of Decatur,* 262 U. S., 432, 43 S. Ct., 613, 67 L. Ed., 1065; *Southern Iowa Electric Co. v. Chariton,* 255 U. S., 539, 41 S. Ct., 400, 65 L. Ed., 754; *Milwaukee Electric Railway & Light Co. v. State of Wisconsin, etc.,* 252 U. S., 100, 40 S. Ct., 306, 64 L. Ed., 476, 10 A. L. R., 892; *Columbus R. P. & Light Co. v. Columbus,* 249 U. S., 399, 39 S. Ct., 349, 63 L. Ed., 669, 6 A. L. R., 1648; *N. Y. Elec. Lines Co. v.*

*Empire City Subway Co.,* 235 U. S., 179, 35 S. Ct., 72, 59 L. Ed., 184; *Cleveland v. Cleveland Electric Co.,* 201 U. S., 529, 26 S. Ct., 513, 50 L. Ed., 854; *Cleveland v. Cleveland City R. Co.,* 194 U. S., 517, 24 S. Ct., 756, 48 L. Ed., 1102; *Southern Wis. Ry. Co. v. Madison,* 240 U. S., 457, 36 S. Ct., 400, 60 L. Ed., 739; *Michigan Ry. Co. v. Lansing* (D. C.), 260 F., 322; *Minneapolis v. Minneapolis St. Ry. Co.,* 215 U. S., 417, 30 S. Ct., 118, 54 L. Ed., 259; *City R. Co. v. Citizens' St. R. R. Co.,* 166 U. S., 558, 17 S. Ct., 653, 41 L. Ed., 1114; *Spartanburg v. South Carolina Gas & Elec. Co.,* 130 S. C., 125, 125 S. E., 295; *Charleston Consolidated Ry. & Lighting Co. v. City Council of Charleston,* 92 S. C., 127, 75 S. E., 390; *Sumter Gas & Power Co. v. Sumter,* 283 F., 931 (C. C. A., 4th Circ., 1922). See, also, 10 A. L. R., 897, note (citing many authorities from various jurisdictions), and authorities from Cook Corp., page 3700, § 913 (citing and abstracting many cases).

It clearly appears that under the terms of the contract, created by ordinances adopted by council of the City of Columbia, even if losses be conceded in the operation of the street car system, such could not constitute a defense. In this connection attention is directed to the following authorities: 6 A. L. R., 1659, note; 10 A. L. R., 897, note; *Spartanburg v. S. C. Gas & Electric Co.,* 130 S. C., 126, 125 S. E., 295; *Thomas et al. v. Spartanburg Ry., Gas & Electric Co.,* 114 S. C., 74, 103 S. E., 149; *Columbus Railway, Power & Light Co. v. City of Columbus, Ohio,* 249 U. S., 399, 39 S. Ct., 349, 63 L. Ed., 669, 6 A. L. R., 1648; *City of Vicksburg v. Vicksburg Waterworks Co.,* 206 U. S., 496, 27 S. Ct., 762, 51 L. Ed., 1155. In our opinion the cases are squarely in point and conclusive of the question now under consideration. The contention of the company that the ordinances simply granted a permissive right to operate the electric railway cars upon the streets of the city cannot be sustained. The rights granted were naturally binding and required operation by the company of the electric street rail-

way cars. In the case of *Columbus Railway, Power and L. Company v. Columbus,* 249 U. S., 399, 39 S. Ct., 349, 63 L. Ed., 669, 6 A. L. R., 1648, the Court in distinguishing the case of *Chicago, M. & St. P. R. R. Co. v. Hoyt,* 149 U. S., 1, 13 S. Ct., 779, 37 L. Ed., 625, cited and relied on by respondents, concludes with this statement of the rule: "It certainly was not intended to question the principle, frequently declared in decisions of this Court, that if a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail." See cases cited in said case. As was said by the Court in the case of *Day v. United States,* 245 U. S., 159, 38 S. Ct., 57, 58, 62 L. Ed., 219: "One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking. * * *. But when the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risk of the obstacles to that extent."

Attention is also called to the following authorities: *Georgia Ry. & Power Co. v. Decatur,* 262 U. S., 432, 43 S. Ct., 613, 67 L. Ed., 1065; *Southern Iowa Electric Co. v. Chariton,* 255 U. S., 539, 41 S. Ct., 400, 65 L. Ed., 764; *Milwaukee E. R. & Light Co. v. Wisconsin,* 252 U. S., 100, 40 S. Ct., 306, 64 L. Ed., 476, 10 A. L. R., 892.

As to the consideration supporting the contract, it is sufficient that "the consideration received by the company is the right to operate and use the streets, and the consideration received by the city is the obligation of the company to operate." The contract is supported by these mutual considerations. *New York Elec. Co. v. Empire City Subway Co.,* 235 U. S., 179, 35 S. Ct., 72, 59 L. Ed., 184; *Owensboro v. Cumberland Tel. & Tel. Co.,* 230 U. S., 58, 33 S. Ct., 988,

57 L. Ed., 1389; *City R. Co. v. Citizens' St. Ry. Co.*, 166 U. S., 557, 17 S. Ct., 653, 41 L. Ed., 1114; *Detroit v. Detroit Citizens' St. Ry.*, 184 U. S., 368, 22 S. Ct., 410, 46 L. Ed., 592; *Potwin Place v. Topeka R. R.*, 51 Kan., 609, 33 P., 309, 37 Am. St. Rep., 312.

As to the development company contracts involved in the proceeding, in passing upon the questions connected with the same it is well to keep in mind the principle stated by the Court in the case of *City of Potwin Place v. Topeka Ry. Co.*, 51 Kan., 609, 33 P., 309, 311, 37 Am. St. Rep., 316; to-wit: "* * * whether the company's duties be denominated contract obligations, or duties imposed by the terms on which a franchise has been granted, the duties are essentially public, and such that no adequate remedy in the ordinary course of legal proceedings is afforded the plaintiff and its citizens."

As contended by petitioners, and shown by the record to be correct statement of the facts, much of the electric railway system was either constructed or acquired under contracts with the several development companies, which required permanent operation from the very nature of the transactions. Take for instance the Shandon line: it was acquired in the year 1909 by deed executed in pursuance of a lease made in 1902 for ninety-nine years, in which it was stipulated that the company will, during said period, continuously operate said line of railway by running at least one car per hour each way over same between the hours of 7:30 a. m. and 8:00 p. m., daily.

As to the Hyatt's Pavilion-Columbia College-North Columbia line, it was acquired, 1906, under contract with the North Columbia Land Company, in which contract it was provided that after the completion of the line the company would "thenceforth maintain and keep it in good condition and repair, and run and operate street railway cars over the said line and extension in connection with the lines of street railway in and near the said City of Columbia on

convenient and reasonable schedules of not less than one car for every hour, from 8 o'clock in the morning to 8 o'clock at night, and as much later and oftener as travel will warrant, of each day, at one fare of not more than 5 cents for each passenger from and to any of the usual stopping places on any of its lines, including the line of said Improvement Company and the proposed extension." (Charters, page 15.)

The Shandon Annex line of street railway was built and operated under contract made in the year 1910, which contract provided that the company would maintain a "regular schedule of not less than one car per hour to the corner of Main and Gervais Streets, and furnish transfers in the usual manner, and that after the delivery of an absolute transfer of the lines and appurtenances, including the right-of-way in perpetuity, * * * the railway company agrees to put in operation the schedule above described and to maintain the same." In connection with this line, Shandon Annex, we call attention to the statement of the Court in the *Western Union Tel. Company v. Penn. Co.* (C. C. A.), 129 F., 849, 862, 68 L. R. A., 968, to-wit: " * * * Apart from those contracts, which, from their inherent nature, imply a power of revocation, it would seem that the intention of parties to an agreement, that it should be perpetual and without limit as to duration, could not be more properly expressed than by silence as to any time limit, or power of revocation. * * * "

The Eau Claire line of railway, which was acquired in 1900, was constructed by the Columbia & Eau Claire Electric Railway Company for the purpose of giving a means of transportation to the people of the Hyatt or Eau Claire community, and the right-of-way for said railway was granted in consideration of "the advantage and benefit to the intervening lands," which the construction of such railway would produce.

The line of electric railway known as the Colonial Heights Line, acquired in 1912, was built in 1907, and was constructed by the Suburban Home Company, which company

was engaged in selling lots in the section known as Colonial Heights, under a contract in writing guaranteeing electric railway transportation to the City of Columbia to be furnished not later than a year from the date of said written contract or contracts; that is, to begin to furnish the transportation by that time.

As a matter of fact, all of these lines of railway were to furnish a way of transportation to and from the City of Columbia to the people of these several communities, and the said electric railway lines constituted the principal inducement in the purchase of lots at the several places and becoming settlers there; it being provided in the contracts that the electric railway transportation would be permanent.

It may also be mentioned that the rights-of-way and poles used in connection with furnishing the electric railway service in these several sections were also used for carrying the electric current which was sold for light and power; and, furthermore, to this time the Broad River Power Company is still using the same poles and right-of-way for the purpose of carrying electricity sold to the people for light and power.

We do not agree with the conclusion reached by the referee as to these lines, but on the other hand, it is our view that the contracts embrace and require the operation of the entire system. Further, we agree with the contention of petitioners that the obligation resulting from these development company contracts is valid and subsisting, and is such an obligation as is enforceable in this proceeding. In support of this position, in addition to authorities already cited, we call attention to the following: *Franklin Telegraph Co. v. Harrison,* 145 U. S., 459, 12 S. Ct., 900, 36 L. Ed., 776; *McKell v. Chesapeake & Ohio Ry. Co.* (C. C. A.), 175 F., 321, 20 Ann. Cas., 1097 (1910); *Western Union Tel. Co. v. Penn. Co.* (C. C. A.), 129 F., 849, 68 L. R. A., 968; *Schiller Piano Co. v. Illinois Northern Utilities Co.,* 288 Ill., 580, 123 N. E., 631, 11 A. L. R., 454; *International*

& *Great Northern Ry. Co. et al. v. Anderson County, City
of Palestine,* 246 U. S., 424, 38 S. Ct., 370, 62 L. Ed., 807.
*Cf. Potwin Place v. Topeka R. Co.,* 51 Kan., 609, 33 P.,
309, 37 Am. St. Rep., 312.

The development company contracts were made for the
benefit of the public, and this furnishes an additional reason
for holding that the same are enforceable in this proceeding.
*Mfg. Co. v. Mass. Bonding Co.,* 103 S. C., 55, 87 S. E.,
439; *Standard Oil Co. v. Powell Paving Co.,* 140 S. C., 39,
138 S. E., 544; *Poole v. Water Co.,* 81 S. C., 438, 62 S. E.,
874, 128 Am. St. Rep., 923; *State v. North Eastern R. R.
Co.,* 9 Rich., 247, 67 Am. Dec., 551; *State of Washington
ex rel. Grinsfelder v. Spokane St. Ry. Co.,* 19 Wash., 518,
53 P., 719, 41 L. R. A., 515, 67 Am. St. Rep., 739; *San
Antonio Street R. Co. v. State ex rel. Elmendorf* (Tex. Civ.
App.), 38 S. W., 54; *State ex rel. Bridgeton v. Bridgeton,
etc.,* 62 N. J. Law, 592, 43 A., 715, 45 L. R. A., 837; 38
C. J., 805; 25 R. C. L., 205; 12 R. C. L., 221.

In addition to what has already been shown herein, we
do not agree with the contention of the respondents as to
heavy losses being inevitable to operate the street car system.
In our opinion this contention has not been established. In
a hearing before the Railroad Commission of South Caro-
lina, in which proceeding the said Commission, after taking
a lot of testimony and making a thorough investigation,
issued an order requiring the corporate respondents to oper-
ate the street cars, the respondents failed to convince the
Commission that the system could not be operated except by
an inevitable heavy loss. On the other hand, the South Car-
olina Railroad Commission reached the conclusion that the
system could be made to yield a fair return if honestly oper-
ated in a business manner. In the order issued by the Com-
mission the following significant statement was made by
the Commission: "We are of the opinion that by proper
management it (the electric street railway system) can be
made to yield a fair return, but certainly the suicidal policy

it adopted estops it from asking relief upon the ground of unproductive operation." (South Carolina Railroad Commission opinion, July 28, 1927.)

The order issued by the South Carolina Railroad ▮ Commission must be presumed to have been based upon actual facts, knowledge acquired by an investigation conducted by the Commission, and from evidence given at the hearing held; and this Court should attach importance to the finding made by this Commission. In order to show the importance this Court has in the past attached to findings of the South Carolina Railroad Commission, we quote from the case of *Railroad Commissioners v. Railroad Co.*, 74 S. C., 80, 54 S. E., 224, 225, as follows:

" 'The facts were determined by a tribunal well recognized and adopted throughout the land. The defendant was notified, appeared, and contested the facts upon the merits.'

"As the facts were judicially determined by a tribunal empowered by statute to make such adjudication, they are not subject to review by this Court, in the absence of allegation charging fraud or other grounds for setting aside the adjudication."

Also, see the following cases in this connection: *R. R. Commissioners v. S. A. L. Ry. Co.*, 131 S. C., 144, 126 S. E., 622; *R. R. Commissioners v. A. C. L. R. R.*, 71 S. C., 130, 50 S. E., 641.

It is the contention of petitioners that the South Carolina Railroad Commission having, after due hearings, found that the system could be made to "yield a fair return," and the respondents having failed to make application for a rehearing or to appeal as provided and required by the law of this State, the respondents cannot now be heard to question the ruling and order of the Commission, but are bound by the same. There is strength in this position, and the following cases seem to support the same: *Prentis v. A. C. L. R. R. Co.*, 211 U. S., 210, 29 S. Ct., 67, 53 L. Ed., 150; *Columbia*

*Railway, Gas & Electric Co. v. Blease et al.* (U. S. D. C., Eastern Dist. S. C., 1927), 40 F. (2d)—.

In the last-mentioned case, which was an action instituted by the respondents in District Court of the United States, Eastern District of South Carolina, for the purpose of restraining the enforcement of the order of the South Carolina Railroad Commission, in refusing to grant the injunction asked for, Judge Cochran based his order in part upon the ground that the company had not made an application for a rehearing as provided by the Act governing procedure before the Railroad Commission. On this question Judge Cochran stated: " * * * I shall base my refusal to grant the restraining order in part upon the fact that the plaintiff has not made this application for rehearing to the Railroad Commission. * * *"

Whether the contention of the petitioners as to the effect that should be given to the finding of the Railroad Commission and the failure to apply for a rehearing or appeal therefrom is upheld by this Court or not, great weight should be given to the finding of the Commission that the electric street railway system could be made to yield a fair return if properly operated. As was stated by the Court in the case of *C. & N. W. Ry. Co. v. R. R. Commission of Wis.*, 156 Wis., 47, 145 N. W., 216, 974, "Commission findings on cases of fact are *prima facie* correct and shall not be set aside unless clearly against the weight of evidence or without the jurisdiction of the Commission."

See, also, *Chicago Bus Co. v. Chicago Stage Company,* 287 Ill., 320, 122 N. E., 477; *N. & W. Ry. Co. v. Pub. Service Commission,* 82 W. Va., 408, 96 S. E., 62, 8 A. L. R., 155.

In this connection we call attention to the fact that in report of the referee he does not seem to have considered the evidence taken before the Commission, though he recommends the dismissal of the Commission's order.

It is contended by the petitioners that the real reason for the company's efforts to discontinue the electric railway operation is that the electric light and power departments are more profitable and less troublesome than the electric street railway, and further contended that because of this the company planned to put an end to the electric street railway business, and with this end in view purposely operated the electric street railway business in a manner to be able to show a heavy loss. In this connection petitioners call the Court's attention to certain matters appearing in the record, to which reference will be made.

In support of petitioners' contention that the electric street railway business can be operated successfully and with a reasonable profit, attention is called to the fact that in the year 1923 the operating revenue for the so-called electric department was $955,734.00, against $249,252.00 operating expenses for the same year; that the operating revenue for the year 1924 for said system was $1,039,678.00, against $253,092.00 operating expenses for the same year. As admitted by petitioners, these figures do not take into account interest, taxes and depreciation; but even allowing for such fixed charges, it is hard to conceive why the business cannot be operated without any great loss, even if it be conceded that a large profit cannot be made. Petitioners concede that a much larger profit would be realized by the company by discontinuing the electric railway business and conducting only an electric light and power business, so as to be able to sell all of the electric power produced for light and power purposes and thus be able to realize a larger profit and avoid the trouble of conducting the electric street railway business.

The respondents point to the street car strike of 1922 as a cause of the beginning of the alleged failure of the street car business, while on the other hand, the petitioners contend that it was and is the duty of the company to so conduct and operate "its system as to keep and maintain the good will of the laboring people, who not only operate the system but

very largely patronize it." In this connection attention is called to the case *In re Loader*, 14 Misc. Rep., 208, 35 N. Y. S., 996, 999. In that case the Court held that a public service corporation is under obligation to try to come to terms with its labor and to continue the operation of its system. With this view we agree. It appears to us that even viewing the strike from the worst angle possible it must necessarily be regarded as a temporary condition and could evidently be removed in a short time by manifesting and exhibiting a reasonable and proper attitude to the employees of the company and to the general public. There is no proof disclosed by the record that this was done by the respondents in the case at bar, and the respondents, therefore, are not in a position to plead the strike in question to their advantage.

Another contention of the petitioners, with which we agree, is that an "unjustified undermaintenance is partly responsible for the alleged losses" suffered by the company in the operation of the said street car system. The evidence clearly shows that there was an undermaintenance of the street car system and, in fact, this is frankly admitted by the respondents. From the testimony of Dr. J. C. Guilds, president of Columbia College, it is shown that the cars in use by the company were rough and regarded by Dr. Guilds as being altogether unsafe. From the testimony of Mr. J. H. Keisler, who had been a member of the town council of the Town of Arden, it clearly appears that the street car service had been poor for the past year or two. Mr. Keisler stated in the course of his testimony that the cars in use were worn out, and ladies were afraid to ride on them. Mr. Spence, the company's superintendent, testified on this point as follows:

"Q. Your street cars, during the last few years of operation, were in pretty bad condition? A. They were.

"Q. Also, the tracks were in bad condition? A. Yes, sir; bad condition."

Also, the testimony of Hoefer, a member of the Columbia city council, testified that following the strike "the service

of the car system was so poor that people would not ride in them (the cars). People would not ride street cars because the service was so poor; the schedule was knocked to pieces."

Mr. Hoefer, member of Columbia city council, also testified: "I don't think there is any doubt about it; I really think if they put a street car system in operation and put it under good management, they will make some money."

With this kind of service the company could not expect to make a profit, but failure was to be expected. In this connection attention is called to the fact that the corporation before the Court is not an "ordinary private money-making corporation," but is a corporation of a "public service character."

As stated above, the respondents admit that the street car system has been undermaintained, and that the service has been poor, which fact is also fully established by testimony from many sources; but they contend that the undermaintenance and poor service has been unavoidable, contending that the earnings of the company did not warrant proper maintenance. In this connection it must be remembered that, under the facts of this case, as pointed out by the referee and also shown herein, the two corporations, Broad River Power Company and the Columbia Railway, Gas & Electric Company, must be treated as one. Further, as has been shown in this opinion, the electric railway service is inseparably linked with the electric light and power and gas business. As to the contention of the respondents that undermaintenance had been unavoidable because the earnings of the company did not warrant adequate maintenance, the same cannot be sustained. It clearly appears all through the record that the combined business of the company has 'paid' handsomely. Take, for instance, the "consolidated income statement" shown in Mr. Barstow's letter of November 15, 1924, for the period of time the company claims to have suffered such disastrous losses on the street car busi-

ness. It is shown that the net earnings of the company were very good. It appears as follows:

December 31, 1922 ........................$550,557.00
December 31, 1923...................... 699,920.00
December 31, 1924...................... 759,515.00

As appears from the record of the case, after paying all interest charges there was a balance left for dividends, depreciation, etc., for three years the sum of $215,072.00, $364,-403.00 and $418,751.00, respectively. It is also established by the record that in the year 1925 the company paid as a dividend on the common stock the sum of $9.00 per share, and in the year 1926 $6.25 per share on the common stock. In addition to this, for each of the years last mentioned, 1925 and 1926, 7 per cent. was paid on the preferred stock. It is clear that the record does not support the contention of the respondents.

There is another feature of the case that should not be overlooked—the admitted purpose of the company to eliminate the electric street railway, "if it were possible to do so." This statement was made by Mr. J. P. Campbell, treasurer of the company, in his testimony. This admission having been made by one in a position to know and speak for the company, other facts in the case can more readily be understood. This was why, no doubt, all of the property mentioned above was transferred to the Broad River Power Company, having in mind eliminating the railway when it was learned that the railway could not be operated with anything like the amount of profit that could be derived from the sale of the electric power for light and power purposes, and thus avoid the inconvenience of operating the electric railway in question. This is the reason assigned by the petitioners for the action of the respondents, and the position finds support in the record.

By the testimony of Dr. Guilds, president of Columbia College, it is shown that the manager in charge of the street railway actually told the doctor that the company did not

want the Columbia College business. The company had been accustomed to carrying on the street cars from the college to the City of Columbia and return on each Sunday, for the purpose of the college girls attending church services in the city, as many as two hundred girls, in addition to the number that used the cars for transportation during the week. The company first increased the price without notice, from 14 cents to 20 cents, and then informed Dr. Guilds that the company did not want the business at all.

It is also established by the testimony that the company intended to discontinue the operation of street cars in the fall of 1925. After making such statement, the company encouraged the operation in the City of Columbia of a bus company and contributed $500.00 each month for the maintenance of the bus company. In all, the company contributed to the bus company as much as $19,000.00 to keep the bus company operating. This act is, of course, wholly inconsistent with a desire to get business for the company, respondent herein. We are not impressed with the reason assigned by the respondents for their acts. The bus company, aided materially by the respondents, sold tickets, in some instances for a lower rate than the street cars. This must have been done with the approval, if not under the instructions, of the respondents, for the respondents aided materially in financing the bus company. The testimony of Mr. W. F. Cleveland, mayor of Eau Claire, furnishes considerable light on this point, which was as follows:

". The buses, after they put buses on, they sold tickets for fifteen fares for a dollar, and the street car company sold ten tickets for a dollar, naturally the people, everybody in that section being working people, railroad people, automobile people, clerks, bank clerks, bookkeepers, and so forth, they just went right on the buses. Naturally that cut off the revenue from the street car because they sold fifteen tickets for a dollar and the street car sold only ten. They run the buses right ahead of the street car. When you would see a

bus coming, you would know the street car was behind, but the bus was always in front. Of course, they got all the traffic."

It is impossible to conceive of the respondents permitting this kind of conduct if it did not meet their approval, bearing in mind that respondents were putting up money for the bus company to carry on its business. Also, the testimony of Mr. Addison, a councilman of the Town of Eau Claire, adds strength to what has already been stated on this line. On this point Mr. Addison testified:

"Mr. Woodring (manager of the company) told me that he would be glad if we would let the buses come in. I was very much surprised. I thought he would encourage me in my encouragement to him. When he said go ahead, and let the buses come, I was surprised.

"Q. What did he tell you about competition being the life of trade? A. He said, if he was in my place, he would let them come. That competition was the life of trade."

In this connection we call attention to the fact, shown by the record in the case, that in showing the alleged loss sustained by the Columbia Railway, Gas & Electric Company the respondents made a charge against the Columbia Railway, Gas & Electric Company for power furnished by the Broad River Power Company for the year 1926, for the sum of $27, 504. 60, and the record shows that in making this charge the rate was 26 2/3 per cent. higher than that charged the Pacific Mills.

Such an attitude points to only one conclusion, that the respondents were formulating plans to quit operating their street car system, and did not protect the same. There is no wonder and no surprise that the gross income of the so-called "railway department" decreased with each passing year, and we cannot escape the conclusion, when the record is considered as a whole, that the respondents did not make a *bona fide* effort to make the street railway business a success. We also find as a fact that the people of Columbia and

the other places named in the petitions, desired to patronize the street cars, and in our opinion if the street car system had been properly maintained, as it could and should have been, the same would have been patronized by the public generally. We find further as a fact, from the record of the case, that a well-maintained electric street railway system is greatly needed by the public generally in the City of Columbia and the other places named in the several petitions in the case, and that the public has been greatly inconvenienced because of the company's failure to operate and maintain in good condition the said electric street railway system, and that the public will continue to be greatly inconvenienced if the street car service is not restored as asked for in the petitions of the several petitioners. We also find as a fact, from the record of the case, that the said electric street railway system can be made to yield a fair return if properly managed and properly maintained.

We desire to state that in this opinion we have not undertaken to refer to all of the testimony in the case, because of the length of this opinion; and, too, because we did not consider it necessary; but the same has been considered.

We do not agree with the referee in holding that the Attorney General is not the proper party to institute the proceeding. In our opinion the authorities are opposed to the view expressed by the referee.

"As the chief law officer of the State, he may, in the absence of some express legislative restriction to the contrary, exercise all such *power* and *authority as public interests may from time to time require,* and may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights.*" (Italics added.) 2 R. C. L., 917.

"Where the injury sought to be redressed is public in its nature, the Attorney General may institute proceedings in his own relation against a private corporation, even though

the wrong complained of results in private as well as public harm." 2 R. C. L., 925.

See, also, the following authorities: *State v. Corbin,* 16 S. C., 533; *State v. Cunningham,* 83 Wis., 90, 53 N. W., 35, 17 L. R. A., 145, 35 Am. St. Rep., 27; *State v. Milwaukee Electric R. & Light Co.,* 136 Wis., 179, 116 N. W., 900, 18 L. R. A. (N. S.), 672.

" * * * The general rule is that *mandamus will lie on the relation* of the Attorney General acting for and in the *name of the State,* or in some cases on the *relation of a municipality or a particular officer or board, or* of a *private individual,* to *compel* a *corporation* to perform a *specific legal duty which it owes to the public, or to the relator* as one *of the public,* unless some other adequate remedy is provided; or unless, as is the case in some jurisdictions, the wording of the statute regarding issuance of the writ is such as to preclude its issuance against private corporations or their officers." (Italics added.) 38 C. J., 803.

See, also, *Marion Electric Light Co. v. Rochester,* 149 Ky., 810, 149 S. W., 977; *State v. A. C. L. R. R. Co.,* 53 Fla., 650, 44 So., 213, 13 L. R. A. (N. S.), 320, 12 Ann. Cas., 359; 2 R. C. L., 927.

The rights of the intervening petitioners are, in our opinion, properly determinable in this proceeding. It is also our opinion that the Railroad Commissioner's order cannot be disregarded.

The judgment of this Court is that the petition of the Attorney General and the petitions of the interveners be, and the same are hereby granted, and the *writ of mandamus* issue, as prayed for.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE COTHRAN (dissenting) : This is a proceeding in the original jurisdiction of this Court for a *writ of mandamus,* to require the respondents to resume and continue the operation of the electric street railway system in the

City of Columbia, the operation of which has been discontinued since March 11, 1927.

The history of the litigation is succinctly stated in the report of the special referee, to whom all issues of law and fact were referred by an order of this Court, dated January 11, 1928.

After taking a mass of evidence, the special referee filed an elaborate report, dated August 16, 1928, in which he recommended a dismissal of the main and intervening petitions. To this report both parties filed exceptions which fairly raise the questions hereinafter considered.

It appears to be a work of supererogation to attempt to add anything to the elaborate and conclusive report of the special referee, which has fully justified the confidence of the Court in his industry, ability, and discriminating judgment. But for the fact that the parties litigant are entitled at least, to the assurance that the case has been most laboriously and carefully considered by the Court, I would content myself with a formal order making the report the judgment of this Court. It is a case of the greatest moment to all parties concerned, and has received the most patient and earnest consideration.

A brief chronology of the events connected with the charters and consolidation of the several corporations involved, is as follows:

In 1882, the Columbia Street Railway Company was chartered by Act of Assembly.

In 1887, the Congaree Gas & Electric Company was chartered.

In 1890 the Columbia Electric Street & Suburban Railway & Electric Power Company was chartered.

In 1891, an Act of Assembly authorized a consolidation of the Congaree Gas & Electric Company and the Columbia Electric Street & Suburban Railway & Electric Power Company, under the name of the Columbia Electric Street Railway, Light & Power Company, and the acquisition by such

consolidated company of the property and franchises of the Columbia Street Railway Company which would then enter into and be absorbed by the consolidated company.

In 1892, the consolidated company acquired the property and franchises of the Columbia Street Railway Company, and having perfected the consolidation permitted by the Act of 1891, became possessed of the property and franchises of these three corporations, (1) The original horse-car company of 1882, (2) the gas and electric company of 1887, and (3) the electric street railway and power company of 1890, with all of the privileges and obligations of the several constituent companies.

The duration of the charter of each of these companies was 30 years, and that of the consolidated company, 50 years.

In 1892, the consolidated company obtained permission from the city council, by an ordinance, to change the motive power of the horse-car line to electricity, and to lay tracks upon other streets; under it the electric railway system was installed and operated.

In 1907, the Suburban Transit Company was chartered, and was authorized by city council to lay tracks upon certain streets.

In 1911, the name of the consolidated company was changed to Columbia Railway, Gas & Electric Company.

In 1912 the consolidated company, under its new name, acquired the property and franchises of the Suburban Transit Company.

Later in the same year, 1912, the charter of the consolidated company was amended, under the general law, so as to continue in force *in perpetuity*.

The consolidated company continued the maintenance and operation of the four branches of the business, the gas, electric lighting, electric power, and street cars, until 1924, when what is known as the Barstow interests was introduced upon the scene.

At some time during the year 1924, the Barstow interests acquired all, or substantially all, of the capital stock of the consolidated company. (It will be noticed that whenever, in this opinion, the expression "consolidated company" is used, reference is to the Columbia Railway, Gas & Electric Company, referred to in the report of the special referee as the Columbia Railway Company), which under the Act of 1891 was a consolidation of the Columbia Street Railway Company, the Congaree Gas & Electric Company, and the Columbia Electric Street & Suburban Railway & Electric Power Company.

After the acquisition by the Barstow interests of the capital stock of the consolidated company, they organized the Broad River Power Company, under a charter granted by the Secretary of State, with a capital stock, afterwards increased to $20,000,000. Common and preferred stock to the amount of (in round numbers), $8,000,000 was issued, and bonds to the amount of $13,000,000.

The general nature of the business proposed to be conducted by this corporation included the building, constructing, acquiring by purchase, lease, consolidation, merger, or otherwise, and operation, of street railways, etc.

At that time it appears that the street railway system, owned and operated by the consolidated company (along with its gas, electric, and power businesses), was being operated at a substantial loss.

I think that it may be read between the lines, and from subsequent developments, that the Broad River Power Company proposed to acquire all of the property of the consolidating companies in a way that would relieve them of the obligation to operate the losing proposition of the street railway system.

A very substantial asset of the consolidated company was its interest in the Columbia Canal. Beginning prior to 1919, and continuing to 1923, there was a controversy between the State and the consolidated company, in reference to the re-

spective rights and interests of the parties in the canal property, which resulted in an effort on the part of the State to declare the rights of the consolidated company forfeited, as will appear by reference to the reported cases on appeal in *State v. Columbia Ry., Gas & Electric Co.,* 112 S. C., 528, 100 S. E., 355; Id., 129 S. C., 68, 123 S. E., 646; Id., 261 U. S., 236, 43 S. Ct., 306, 67 L. Ed., 629. This litigation eventuated in favor of the consolidated company, but it did not entirely compose the differences between the parties. It was, of course, of interest to the Broad River Power Company that these differences be completely adjusted.

The General Assembly had created the Canal Commission for the purpose of setting the controversy between the parties, and it was then functioning.

The Broad River Power Company, then interested in the double project of composing the differences between the consolidated company and the State, in reference to the canal (in part a source of their power supply), and in acquiring the properties of the consolidating companies without the obligation to operate the street car system, entered into negotiations with the Canal Commission for the settlement of the canal controversy. They attempted to combine the two projects referred to, by submitting drafts of two bills to be passed by the General Assembly: One a bill to settle the canal controversy, and the other a bill authorizing the consolidated company and six other corporations subsidiary to it, including the Columbia (Congaree?) Gas Light Company, to merge or consolidate with, or to sell, transfer, and convey to any one or more of them, or to the Broad River Power Company, all or any part of their respective properties, assets, franchises, charter, or other rights, etc.

The proposed bills, however, appear to have been acted upon by the Canal Commission and by the General Assembly, independently of each other.

The business terms of the bill settling the canal controversy were agreed to by the Canal Commission, a reference therein

to the other bill having been struck out, and the bill became a law, 34 Stat. 852, approved March 24, 1925.

The members of the commission, individually, recommended the passage of the other bill, which also became a law, 34 Stat. 842, approved March 19, 1925.

Purporting to proceed under the Act of March 19, 1925, referred to in the report of the special referee as "the merger or enabling Act," there was conveyed to the consolidated company all the properties of its subsidiaries, by deeds dated June 15, 1925, and on the same day the consolidated company, also purporting to act under the authority of the Act of March 19, 1925, executed a deed to Broad River Power Company, conveying all of the property theretofore owned by it, including that which it had acquired from its subsidiaries on that day, with the following reservations:

"Saving and excepting, and Columbia Railway, Gas & Electric Company expressly retains the following:

"(a) Its franchises to operate and maintain its street railway in the County of Richland, State of South Carolina within and without the City of Columbia and other municipal corporations in said County.

"(b) All easements, rights of way, rights and privileges necessary for operation of said street railway.

"(c) All street cars, tracks, ties, overhead conductors, brackets, spans, tools, repair equipment, material and supplies used or useful exclusively for street railway purposes.

"(d) All that lot or parcel.  *  *  *"

The deed also conveyed "all poles, including those used exclusively for street railway," the substation, and the car barn, which had been used principally in connection with the street railway business.

The relief prayed for by the petitioners is "double-barreled" in its nature: A writ of mandamus to compel the consolidated company to maintain and operate the street car system, and a similar writ to compel the Broad River Power Company to do the same thing.

I. The first inquiry is whether or not, under the circumstances, the consolidated company is under a legal obligation to maintain and operate the street car system, the special referee having found as a matter of fact that the rehabilitation and operation of the system will result (as its operation heretofore has resulted), in devastating loss.

The main reliance of the petitioners to sustain the affirmative of this inquiry is the consolidating Act of 1891, by which the consolidated company acquired all of the property rights and franchises, with all of the privileges and obligations, of the constituent consolidating companies, one of which was the corporation authorized to maintain and operate the street car system, the Columbia Electric Street & Suburban Railway & Electric Power Company.

The inquiry naturally arises, then, as a ligament which would bind the consolidated company to the obligation to operate the street car system, whether the corporation thus acquired through the consolidation Act of 1891, by the consolidated company, was under a legal obligation to do so, regardless of the devastating loss that such maintenance and operation would entail; for if such constituent element in the consolidation was not under such obligation, and the consolidated company acquired the property, franchises, and *privileges*, subject to its obligations, of the constituent corporation, it would appear illogical and unjust, in the absence of an express undertaking, to impose upon the consolidated company an obligation which the constituent corporation had not assumed, or which had not been imposed upon it.

I think that it is clear, from the authorities, that under the consolidation Act of 1891, the consolidated company acquired, no more and no less, the property, franchises, privileges, and obligations of each of the constituent corporations.

In the case of *Philadelphia & Wilmington R. Co. v. Maryland,* 10 How., 376, 393, 13 L. Ed., 461, the effort was to relieve one of the consolidating companies from certain taxes which it was liable for, prior to the consolidation. The Court

said: "And the law which authorizes these two companies to unite themselves with the plaintiff in error declares that this new corporation * * * shall be entitled within this State to all the powers and privileges and advantages at that time belonging to these two companies. It grants it nothing more. Now, as these companies held their corporate pirvileges under different charters, the evident meaning of this provision is, that whatever privileges and advantages either of them possessed should in like manner be held and possessed by the new company, to the extent of the road they had respectively occupied before the union; that it should stand in their place, and possess the power, rights, and privileges they had severally enjoyed in the portions of the road which had previously belonged to them. And this intention is made still more evident by the fourth section of the law, which makes the new corporation responsible for the contracts, debts, obligations, engagements, and liabilities at law or in equity of the several companies. * * * The plaintiff in error, therefore, took the property of the * * * Company with all the liabilities to which it was subject in the hands of that company."

The case of *Tomlinson v. Branch,* 15 Wall., 460, 465, 21 L. Ed., 189, is of interest from its familiar local coloring as well as from the legal principles announced. The South Carolina Canal & Railroad Company was chartered in 1827. It constructed a railroad from Charleston to Hamburg via Branchville, which was completed in 1833. Its charter gave it an exemption from all taxes *for a period of 36 years.* This period expired in 1869. In the meantime, in 1835, the railroad company, the predecessor of what was afterwards known as the South Carolina Railroad Company, was chartered. It was given *a perpetual exemption* from all taxes. By the charter it was authorized to construct a railroad from Charleston through the states of Kentucky, Tennessee, North Carolina, and South Carolina; the objective being a connection with the west at Cincinnati and the sea at Charles-

ton. In substantially the language of the late Judge Memminger, the conduct of the war did not keep pace with the grandiloquence of the manifesto, for the construction extended only from Branchville to Columbia, with a branch about midway, to Camden. By reason of the exclusive privileges granted to the Hamburg line, the South Carolina Railroad Company met with difficulty in entering Charleston, and after negotiations between the two companies, an agreement was entered into by which the Hamburg line was merged into the other. In 1843 this amalgamation was legally authorized by an Act of the General Assembly, which provided that all of the rights, privileges, and property belonging to the Hamburg line should be vested in the South Carolina Railroad Company, which should be liable for all the debts and contracts of the other line.

After the expiration of the exemption from taxes of the Hamburg line, which occurred as stated in 1869, the stockholders of the South Carolina Railroad Company filed a bill in equity in the Court below against the said company, as also against one Tomlinson, state auditor, and certain county collectors, to enjoin the company from paying, and the others from collecting, certain taxes imposed upon the company in pursuance of the Acts of the Legislature of South Carolina; it being alleged in the bill that the said company was by charter exempt from taxation and that no adequate legal remedy existed under the laws of the State to obtain redress; the stockholders contending that by the merger of the South Carolina Canal and Railroad Company in the South Carolina Railroad Company, the property of the former is held by the latter, with all the rights and privileges of its own charter attaching thereto, including the right of perpetual exemption from taxation.

The Circuit Court sustained the contention of the South Carolina Railroad Company, in reference to the tax exemption of both companies; but upon appeal to the United States Supreme Court, the claim of exemption upon the property

of the South Carolina Railroad Company, not acquired from the Hamburg line, was disallowed; upon the other property the claim was allowed.

In reference to the succession of the South Carolina Railroad Company, to the rights and privileges of the Hamburg line, the Court said: "The keeping alive of the rights and privileges of the old company, and transferring them to the new company in connection with the property, indicates the legislative intent, that such property was to be holden in the same manner and subject to the same rights as before. The owners of the property were to lose no rights by the transfer, nor was the public to lose any rights thereby. * * * But all its rights and duties, its privileges and obligations, as related to the public, or to third persons, remain, and devolve upon the new company."

In the case of *R. Co. v. Blake*, 9 Rich, 233, the Court said: "The South Carolina Railroad Company by an Act of 1843 (11 Stat. 273), has all the rights and privileges which belonged to either the South Carolina Canal and Railroad Company under its charter of 1828 (8 Stat. 355), or to the Louisville, Cincinnati and Charleston Railroad Company under its charter of 1835 (8 Stat. 409)."

In the case of *Delaware Railroad Tax*, 18 Wall., 206, 227, 21 L. Ed., 888, the Court said: "The purpose of the two provisions was to vest in the new company the rights and privileges which the original companies had previously possessed under their separate charters. * * * "

" 'Consolidation' is not sale, and when two companies are authorized to consolidate their roads, it is to be presumed that the franchises and privileges of each continue to exist in respect to the several roads so consolidated." *Green County v. Conness*, 109 U. S., 104, 3 S. Ct., 69, 70, 27 L. Ed., 872.

"It will be observed that a consolidated company formed under this Act acquires all the rights, privileges, and franchises possessed by its constituent companies." *New Orleans*

*Co. v. Louisiana Co.,* 115 U. S., 650, 6 S. Ct., 252, 255, 29 L. Ed., 516.

In *Punxsutawney v. Gas Co.,* 238 Pa., 23, 85 A., 1003, 1006, the Court said: "The corporation merger and consolidation Act * * * provides in Section 3 that the new corporation shall be possessed of 'all the rights, privileges and franchises' theretofore vested 'in each of' its constituent corporations, and that 'all debts, duties and liabilities of each of said constituent corporations shall thenceforth attach to the new corporation.' As stated by the learned Court below: 'The weight of the authorities seems to be that, when the Act of consolidation gives to the consolidated company the rights and privileges of the constituent companies or makes the consolidated company subject to the obligations of the constituent companies, the rights and obligations are not extended by the Act to all of the property of the consolidated company, but only apply severally to the property of each constituent company taken over by the consolidated company' "—citing many authorities.

Now, then, as to the relation of the constituent corporation, the Columbia Electric Street & Suburban Railway & Electric Power Company, in reference to its legal obligation to operate the system:

The charter Act of 1890 conferred on that company authority to construct and operate an electric line of street railway in the City of Columbia, with the consent of the city council, and to extend the same five miles into the country from the State Capitol. What the special referee stated in reference to the charter of the consolidated company is equally true of the charter of this constituent corporation:

"The franchise obtained from the State and confirmed by the City having been *received and acted* upon by the railway company, reciprocal obligations necessarily arose. In other words, a *contract* was thereby created. This proposition rightly understood seems to be indisputable. The railway company having thus undertaken to serve the public, under

the authority so granted by the public through their agencies, thereby assumed an obligation which could not be thrown off at will. *Harmon v. Columbia & Greenville Railroad Co.,* 28 S. C., 401, 5 S. E., 835, 13 Am. St. Rep., 686; *Moore v. Railroad Co.,* 38 S. C., 24, 16 S. E., 781, 14 C. J., 161–162.

"The real question in this connection is not whether there was a contract, but the nature of the contract and the extent of the obligations thereby imposed. If the ordinances adopted by the city contained nothing whatever except permission to lay the tracks in the streets and operate the railway, as soon as this permission was acted upon, that is to say, *accepted,* the obligation to exercise the franchise and perform the service came into existence. This, however, would not create a contract to continue the operation of the railway indefinitely or in perpetuity without regard to whether or not reasonable compensation was afforded for the services rendered. A contract resulting in an obligation so onerous as this could not be thus *implied.* The decisions of the Supreme Court of the United States are clear beyond all doubt that such a contract cannot be elicited from the acceptance of a charter from the State for the operation of a railroad, even where the drastic power of eminent domain has actually been exercised. It follows with equal force that such a contract cannot be elicited from the fact that the consent of the city was sought and obtained as required by the charter."

In support of this proposition, the referee quotes at length from the cases of *R. R. Com. v. R. Co.,* 264 U. S., 79, 44 S. Ct., 247, 68 L. Ed., 569, and *Bullock v. R. Co.,* 254 U. S., 513, 41 S. Ct., 193, 65 L. Ed., 380, which are quite apposite; the quotations need not be repeated here, as the report will be incorporated in the report of the case.

It has been shown, I think, that so far as the charter is concerned the right to exercise the franchise is permissive only, and contains nothing of so binding an obligation as to require the operation of the system at a distinct loss. The reasoning and conclusion of the referee that there is noth-

ing in the ordinances of the city of like character are satisfactory to me.

There being no express contract in either the statute or ordinance, the rule established by innumerable cases is that the continued operation of a railroad or street car system at a loss cannot be required.

In the case of *Charleston-Isle of Palms Co. v. Shealy* (D. C.), 266 F., 406, 410 (cited by the referee), upon an application by the plaintiff for leave to abandon an unremunerative enterprise, his Honor, Judge H. A. Smith, in a decree granting that relief, said: "As, therefore, the evidence is that, this property can only be operated, so as to perform the duties imposed upon the complainant by its charter, at a continuing loss, there is no power in the public under the state of facts existing in this cause to compel it. The corporation is authorized to abandon and return to the State its charter, franchises, and privileges, and to cease operations, to liquidate by realizing upon what property it may possess (excluding its franchises and public privileges), and pay the proceeds to the parties entitled to receive the same."

In the case of *So. Bell Co. v. R. R. Com.* (D. C.), 280 F., 901, 906, also cited by the referee, the Court said:

"The State, acting for the public, has no right to compel a corporation to render its services free, nor to exhaust its capital in performing work for the benefit of the public. A corporation has a right, if it finds it unremunerative, unless bound to the contrary by a contract, to cease operating and stop its work."

"The power of a Legislature to compel continuity in a business can only arise where the obligation of continued service by the owner and its employees is direct and is assumed when the business is entered upon. A common carrier, which accepts a railroad franchise, is not free to withdraw the use of that which it has granted to the public. It is true that if operation is impossible without continuous loss (*Brooks-Scanlon Co. v. Railroad Commission*, 251 U. S.,

396, 40 S. Ct., 183, 64 L. Ed., 323; *Bullock v. Florida,* 254 U. S., 513, 41 S. Ct., 193, 65 L. Ed., 380), it may give up its franchise and enterprise, but, short of this, it must continue." *Charles Wolff Packing Co. v. Court of Industrial Relations,* 262 U. S., 522, 43 S. Ct., 630, 636, 67 L. Ed., 1103, 27 A. L. R., 1280.

In *Pittsburgh Co. v. R. Co.* (D. C.), 289 F., 133, 134, the question at issue was the power of the Federal Court to authorize a receiver to abandon *part* of an intrastate railroad. It was held that the Court had no such power. In passing the Court said: "Little question is raised but that the owners of a railroad may abandon the entire road, if it cannot be operated without continuous loss, and there is no reasonable prospect of profitable operation in the future"—citing *Brooks-Scanlon v. R. R. Com.,* 251 U. S., 396, 40 S. Ct., 183, 64 L. Ed., 323, and *Bullock v. R. R. Com.,* 254 U. S., 513, 41 S. Ct., 193, 65 L. Ed., 380.

In *Fort Smith Co. v. Bourland,* 267 U. S., 330, 45 S. Ct., 249, 250, 69 L. Ed., 631, the Court, in denying the right to abandon part of a line of street railway, said: "So far as appears, this company is at liberty to surrender its franchise and discontinue operations throughout the city. It cannot, in the absence of contract, be compelled to continue to operate its system at a loss. [Citing the *Brooks-Scanlon case.*] But the Constitution does not confer upon the company the right to continue to enjoy the franchise and escape from the burdens incident to its use."

Hence we conclude that the constituent corporation had the privilege of abandoning its franchise at any moment when the maintenance and operation of the street car system should become disastrously unremunerative.

It follows that when by the consolidation the consolidated company acquired the same rights and was charged with the same obligations as the constituent corporation, it assumed no higher or more onerous obligations than had been imposed

upon that corporation; and that it had the same right of abandonment.

This is not at all inconsistent with the unanimous holdings of the Court that where the corporation retains its franchise and continues to operate under it, it cannot abandon the unprofitable features of the enterprise while retaining the profitable.

"But where a duty which a corporation is obliged to render is a necessary consequence of the acceptance *and continued enjoyment of its corporate* rights, those rights not having been surrendered by the corporation, other considerations are, in the nature of things, paramount, since it cannot be said that an order compelling the performance of such a duty at a pecuniary loss is unreasonable." *Mo. P. R. Co. v. Kansas,* 216 U. S., 262, 30 S. Ct., 330, 336, 54 L. Ed., 472.

"To conclude to the contrary would be but to declare that a corporate charter was purely unilateral; that is, was binding in favor of the corporation as to all rights conferred upon it, and was devoid of obligation as to duties imposed, even although such duties were the absolute correlative of the rights conferred. Was the duty which the order here commanded one which the corporation was under the absolute obligation to perform as the result of the acceptance of the charter to operate the road is then the question to be considered." *M. P. R. Co. v. Kansas,* 216 U. S., 262, 30 S. Ct., 330, 336, 54 L. Ed., 472.

"It may not be doubted that the road, by virtue of the charter under which the branch was built, was obliged to carry passengers and freight, and therefore, as long *as it enjoyed its charter rights,* was under the inherent obligation to afford a service for the carrying of passengers. * * * *Testing the alleged unreasonableness of the order in the light of the inherent duty resting upon the corporation,* etc.," *M. P. R. Co. v. Kansas,* 216 U. S., 262, 30 S. Ct., 330, 336, 54 L. Ed., 472.

But it is contended that when the consolidated company accepted the terms of the consolidation Act, applied to the city for permission to lay its tracks upon the streets and to operate a street car system, and actually maintained and operated it, there was created a binding obligation to continue such operation at any and all cost, though it in time would swallow up the property devoted to the operation of the street railway system and also that of the allied enterprises.

I think that what has been held in reference to the obligation of the particular constituent corporation to operate the system, to its right to abandon it when unremunerative, and to the succession of the consolidated company to that right, is a sufficient answer to the contention of the petitioners.

I also approve of the reasoning and conclusion of the referee to the effect that the fact of loss does not relieve the grantee of a franchise from the obligation it imposes, so long as he continues to hold it; but that for the reasons stated, the principle is inapplicable to the conditions presented in the case at bar.

II. The second inquiry is whether or not, under the circumstances, the Broad River Power Company is under a legal obligation to maintain and operate the street car system, regardless of the fact that its rehabilitation, maintenance and operation would entail devastating losses.

There is less ground for maintaining an application for mandamus against this company than against the consolidated company.

If the consolidated company could not under the circumstances be compelled to operate the system at a loss, and the Broad River Power Company had acquired all of the franchises, rights, and privileges of the consolidated company, it stands to reason that it would have succeeded to the right and privilege of the consolidated company to abandon the operation, under the circumstances. That it seems to me

would be a sufficient reason to refuse the mandamus. But there are others:

The Broad River Power Company has other branches of its business besides the street car system: The gas business, the electric light business, and the electric power business; to require it to rehabilitate, maintain, and operate the street car system at the stupendous loss apparent, the losses would have to be made up out of the net income of the other departments, and it would be but a matter of time until the entire property of the street car system, and the net income from the other departments would be swallowed up in "that Serbonian bog where armies whole have sunk."

In the incomes of those departments, the patrons of them severally have a direct interest, not only that they be maintained at efficiency, but that the rates may not be unreasonably increased, both of which will necessarily be affected by such withdrawals and diversions.

In addition to this, the conveyance of the property of the consolidated company to the Broad River Power Company specifically excepted the acquisition of the franchise of the street car corporation, the matrix of any duty to operate.

The disposition by the special referee of the intervening petitions should be affirmed by this Court.

I think the judgment of this Court should be that the report of the special referee in all respects be confirmed, and that the main and intervening petitions be dismissed.