547 S.E.2d 862

**QUALITY TOWING, INC., Appellant,**

v.

**CITY OF MYRTLE BEACH and William D. Stephens, Respondents.**

No. 25293.

Supreme Court of South Carolina.

Heard Feb. 7, 2001.
Decided May 21, 2001.
Rehearing Denied June 21, 2001.

Robert C. Childs, III and Laura W.H. Teer, both of Mitchell, Bouton, Yokel & Childs, of Greenville, for appellant.

James B. Van Osdell and Charles B. Jordan, Jr., both of Van Osdell, Lester, Howe & Jordan, P.A., of Myrtle Beach, for respondents.

TOAL, Chief Justice:

Quality Towing, Inc. ("Quality") appeals the Special Referee's Order finding in favor of the City of Myrtle Beach ("City").

### FACTUAL/PROCEDURAL BACKGROUND

Quality is a South Carolina corporation engaged in the business of towing vehicles in the Myrtle Beach area. On June 13, 1995, the City Council of Myrtle Beach enacted Ordinance 950613–36 ("1995 Ordinance") which instructed the City Manager to contract with one or more wrecker services to provide towing services for the City. Prior to the issuance

of the Ordinance, the City operated a Rotation List whereby the City rotated among qualified wrecker services when the City needed vehicles towed. Vehicles towed by the City included City owned vehicles, vehicles illegally parked or abandoned, and privately owned vehicles whose owners had requested the City to tow their vehicle. Under the Rotation List, participants executed yearly contracts which terminated on July 31 of each year. Quality had been one of the wrecker services on the City's Rotation List, which was repealed by the 1995 Ordinance.

Under the 1995 Ordinance, the City was required to bid the contract using requests for proposals ("RFP"). According to the RFP, the City would use six weighted criteria to evaluate each proposal: price, equipment, facilities, reputation, ability to perform, and insurance. The City Manager formed a review committee ("Committee") to evaluate the proposals submitted in response to the RFP. The Committee consisted of City employees, but not City Council members, with prior experience with the local towing companies and/or experience in the procurement process. The Committee was instructed to evaluate each of the proposals and to advise and aid the City Manager in his determination of which proposal best met the City's requirements.

Quality submitted a proposal on September 11, 1995. Three other towing companies also submitted a proposal. The Committee held a meeting on September 26, 1995, where the proposals were discussed. The RFP stated the Committee would inspect the premises of the proposers on October 2, 1995. Quality was advised on that day its premises would not be inspected because the Committee had determined its proposal was non-responsive. The only facility inspected on October 2, 1995, was Auto Body Works.

The City Manager, once aware Quality's proposal was deemed non-responsive, overruled the Committee on this issue, and instructed the Committee to consider the merits of Quality's proposal. Quality's facilities were inspected on December 13, 1995. However, the Committee, pursuant to the time frame established in the RFPs, met on October 12, 1995, and decided to recommend Auto Body Works for the contract.

Therefore, the Committee's recommendation was made two months prior to the inspection of Quality's facilities.

The City Manager testified that, after reviewing the Committee's recommendation, he decided to award the contract to Auto Body Works. The contract with Auto Body Works was approved by the City Council at its January 9, 1996, meeting.

On February 16, 1996, Quality filed a complaint against the City and its risk manager William D. Stephens (collectively referred to as the "City") concerning the award of the exclusive contract to another wrecker service. In its complaint, Quality sought an injunction and claimed: (1) the Ordinance was in violation of its civil rights under 42 U.S.C. § 1983 and S.C.Code Ann. § 16–5–60 (Supp.2000); (2) the Ordinance constituted an unlawful trust, monopoly, and restraint of trade; (3) the Ordinance amounted to an inverse condemnation of Quality's property rights; (4) the City acted negligently in its actions; and (5) the City violated South Carolina's Freedom of Information Act [1] ("FOIA").

On June 19, 1997, the lower court granted the City summary judgment on Quality's causes of action for illegal restraint of trade and negligence. On August 27, 1997, the court granted the City summary judgment on Quality's inverse condemnation claim. An order granting a separate trial on the non-jury issues was filed April 7, 1998, and an Order of Reference was filed on May 20, 1998 appointing a special referee.

On April 13, 1999, a hearing was held before the special referee on Quality's cause of action challenging the validity of the ordinance and contract, and on the cause of action concerning alleged violations of the FOIA. By Order dated May 17, 1999, the special referee found in favor of the City. Quality appealed and the issues before this Court are:

I. Did the special referee err in holding the Committee/ Municipal staff meetings are not subject to FOIA?

II. Did the special referee err in finding the City Council's executive session of January 9, 1996, did not violate FOIA?

III. Did the special referee err in determining the contract award was not a franchise?

---

1. S.C.Code Ann. §§ 30–4–10—30–4–110 (Supp.2000)

IV.    Did the special referee err in denying Quality's inverse condemnation claim?

V.    Did the special referee err in finding the Ordinance is valid and does not deprive Quality of its due process rights?

VI.    Did the special referee err in finding there was no impropriety in the bidding or award process?

VII.    Did the special referee err in finding the three-year term of the contract was not impermissibly long?

VIII.    Did the special referee err in finding the Committee did not violate the City and State Procurement Code?

## LAW/ANALYSIS

### I.    The Freedom of Information Act (FOIA) and the Review Committee

■    Quality argues the special referee erred in finding the Committee set up by the City Manager to review the proposals was not subject to FOIA. We agree.

The special referee held the Committee meetings in which the members reviewed the proposals were not subject to FOIA. The special referee ruled the Committee was not a "public body" as defined in FOIA since it was formed for the sole purpose of aiding the City Manager in his determination of which wrecker service should receive the contract. The referee specifically held, "This committee, composed entirely of the City's employees and reporting only to the City Manager, was not a committee, subcommittee, or advisory committee of City Council." We find the referee erred in his holding. The plain language of the statute, as well as the purpose behind FOIA as set forth by the legislature, leads to the conclusion that the Committee is a "public body" subject to FOIA.

■    FOIA is remedial in nature and should be liberally construed to carry out the purpose mandated by the legislature. *South Carolina Dep't of Mental Health v. Hanna*, 270 S.C. 210, 241 S.E.2d 563 (1978). When adopting FOIA, the legislature stated "it is vital in a democratic society that public

business be performed in an open and public manner."
S.C.Code Ann. § 30–4–15 (Supp.2000).

FOIA defines "public body" as:

> any state board, commission, agency, and authority, and
> public or governmental body or political subdivision of the
> State, including counties, municipalities, townships, school
> districts, and special purpose districts . . . including commit-
> tees, subcommittees, advisory committees, and the like of
> any such body by whatever name known.

S.C.Code Ann. § 30–4–20(a). This Court does not need to
look any further than the language of the statute to find the
Committee was subject to FOIA. *Miller v. Doe,* 312 S.C. 444,
441 S.E.2d 319 (1994) ("If a statute's language is plain and
unambiguous and conveys a clear and definite meaning, there
is no occasion for employing the rules of statutory interpreta-
tion. The court has no right to look for or impose another
meaning.").

The fact that the City Manager, and not the City Council,
created the Committee and no council member served on the
Committee, is not enough to remove the Committee from the
definition of "public body" as stated in FOIA. First, it does not
matter that the members of the Committee are not members
of the parent body. *See* 1984 S.C. Op Atty Gen., No. 84–281.
Second, the Committee was set up to give advice to the City
Manager, and ultimately the City Council. It is clear from the
minutes of the City Council meeting and the testimony of
Thomas Leath, City Manager, the Committee's selection pro-
cess and recommendation went directly to the City Council.[2]

Furthermore, the legislature amended the definition of
"public body" in 1987 by adding the phrase "including commit-
tees, subcommittees, advisory committees, and the like of any
such body by whatever name known." Clearly, the legislature
intended for "advisory" bodies, such as the Committee set up
by the City Manager to advise him and the City Council, to be
covered by the definition.

---

**2.** *See Wood v. Marston,* 442 So.2d 934 (Fla.1983) (where committees
are found to be one step, however remote, in the decision-making
process, courts tend to require committees to open their meetings).

■ Finally, the Committee was formed to help determine the award of a City contract. This contract entailed the expenditure of public funds. Because the Committee was not open to the public, Quality was unable to learn its bid had been termed non-responsive and to respond to the Committee's concerns. The Committee made its decision to recommend Auto Body Works to the City in secret. FOIA was enacted to prevent the government from acting in secret. *South Carolina Tax Comm'n v. Gaston Copper Recycling Corp.*, 316 S.C. 163, 447 S.E.2d 843 (1994). In addition, the City has advanced no valid reason to hold the meetings and discussions of the Committee concerning a public contract in private. This kind of secret determination is exactly what FOIA was designed to prevent.

The City also argues the Committee was not performing a "government function", but rather a "proprietary or business function", and therefore is not subject to FOIA. *See* 1984 S.C. Op. Atty. Gen., No. 84-64 (only a committee performing a governmental function are subject to FOIA). The special referee agreed with the City, finding the function performed by the Committee was proprietary in nature. We find a committee formed to give advice to a public body or official is performing a governmental function. *See MFY Legal Servs., Inc. v. Toia*, 93 Misc.2d 147, 402 N.Y.S.2d 510 (N.Y.Sup.Ct. 1977) (the giving of advice to a public body or official is a government function).

We hold the plain language of section 30-4-20(a) clearly includes an "advisory committee" such as the one set up in the instant case. We therefore remand for a determination of what relief, if any, Quality is entitled to as a result of this violation.

## II. Executive Session

Quality argues the City Council's executive session of January 9, 1996, violated FOIA. We agree.

Quality argues two aspects of the executive session violated FOIA. First, they argue City Council went into the session without stating its purpose. Secondly, they allege City Council took formal action in the session.

### A. Announcement

Section 30–4–70(a)(6) (Supp.2000) states:

Prior to going into executive session the public agency shall vote in public on the question and when such vote is favorable the presiding officer shall announce the *specific* purpose of the executive session. (emphasis added).

According to the minutes of the City Council meeting, the following took place:

C. Towing—Contractual Recommendation

Mayor Grissom advised this matter would be discussed in Executive Session

Upon motion by Councilman Cain, seconded by Councilman Woods, Council voted unanimously to go into executive session.

The special referee held, even if FOIA was applicable, there was no violation because: (1) a public vote was taken to go into executive session; and (2) although the minutes of the meeting did not reflect the specific purpose of the executive session, the owner and president of Quality testified he, and everyone else at the meeting, knew the City Council was going to discuss the contract.[3] FOIA is clear in its mandate that the *"specific* purpose" of the session *"shall* be announced." (emphasis added). Therefore, FOIA is not satisfied merely because citizens have some idea of what a public body might discuss in private. As evidenced by the minutes, the presiding officer did not announce the specific purpose of the executive session. This was a violation of FOIA.

The City argues, even if there was no "specific purpose" announced, reversal is not warranted because substantial compliance with FOIA should be found when only a technical violation has occurred, and there has been no demonstrated effect on a complaining party. *See Piedmont Pub. Serv. Dist. v. Cowart,* 319 S.C. 124, 459 S.E.2d 876 (Ct.App.1995). However, given the history and the purpose of FOIA, this was

---

3. The exact testimony of Mr. Rahner, president of Quality, is as follows:

   THE COURT: But you knew that was what they were going to be discussing was the contract for the towing service?

   THE WITNESS: I assumed that. I assumed that's what they were going to be discussing.

more than a "technical violation." The statute clearly mandates the specific purpose of the session must be announced.

Therefore, we hold the clear language and the express purpose of FOIA was violated by the presiding officer's failure to announce the specific purpose for the executive session. We remand for a determination of what relief, if any, Quality is entitled to as a result of this violation.

### B. Formal Action

■ Quality also argues the City Council violated FOIA by taking formal action during an executive session. We disagree.

FOIA prohibits any formal action to be taken in an executive session. S.C.Code Ann. § 30-4-70(a)(6) (Supp.2000). This section defines "formal action" as, "a recorded vote committing the body concerned to a specific course of action." *Id.*

■ Quality alleges the discussions in the executive session concerned whether or not the contract could be awarded to just one wrecker service. This type of "discussion" does not amount to a "formal action." The City Manager testified that during the executive session, City Council only received *legal* advice concerning the term of the contract: whether the City could legally contract with only one wrecker service, and whether it was legal to set the towing rates in the contract. FOIA does allow executive sessions for discussion of negotiations incident to proposed contractual arrangements and for the receipt of legal advice. S.C.Code Ann. § 30-4-70(a)(2). Furthermore, the actual City Council vote on the contract was conducted in public.

### III. Franchise

■ Quality argues the contract awarded by the City to Auto Body Works is a franchise. Therefore, the City was required to pass an ordinance to approve the franchise. We agree.

■ A franchise has been defined as a special privilege granted by the government to particular individuals or companies to be exploited for private profits. *City of Cayce v. AT &*

*T Comms.*, 326 S.C. 237, 486 S.E.2d 92 (1997). Government franchisees are traditionally service-type businesses that are willing to pay the municipality for the privilege of doing business with its citizens. *Id.* A "franchise" is a privilege of doing that which does not belong to citizens generally by common right. *State ex. rel Daniel v. Broad River Power Co.*, 157 S.C. 1, 153 S.E. 537 (1929).

City Council's contract with Auto Body Works is a classic example of a franchise. It granted one company the exclusive right to charge the public for a vendor's services. The 1995 Ordinance took away any common right of citizens to be engaged in certain aspects of the towing business, and made it a privilege granted only to a designated business.

The City granted Auto Body Works the sole and exclusive right to tow vehicles at the request of the City Police and when the owner is either unable or unwilling to request the wrecker service of his choice. The contract grants Auto Body Works the right to tow at the request of the City and private persons who have not "otherwise selected a towing company." In a City which is known for its strong tourist population, many private persons will defer to the City's choice of towing service, since they will not have "otherwise selected a towing company."[4]

---

4. We have found a franchise to be *"special privileges* granted by the government to particular individuals or companies...." *City of Cayce, supra* at n. 2 (citing 12 McQuillin *Municipal Corporations* § 34.01 (1949)) (emphasis added). In this case, Auto Body Works was granted the "special privilege" of becoming the City's default towing service, a privilege that now does not belong to the citizens of the City generally by common right. *See State ex. rel Daniel, supra.* The dissent argues the contract awarded to Auto Body Works provides for services rendered only to the City, not its citizens. As stated above, this is simply not the case. The force of law grants the City the power to tow cars. For example, the cars may be illegally parked or abandoned. The contract at issue in this case determines which towing company will get all the business when these cars are involuntarily towed—Auto Body Works. However, it is not the City who then pays Auto Body Works their towing fee, it is the "citizen" owner of the towed car. It is also the "citizen" owner who has not "otherwise selected a towing company" who then pays Auto Body Works their fee when their car is towed. Therefore, it is the City's residents and businesses who are the primary clientele. Therefore, this is a traditional franchise situation, as it allows Auto Body Works to make money from private citizens. *See City of*

Furthermore, the contract covers more than simply towing disabled or abandoned vehicles from public rights-of-way. It also includes the right to tow vehicles on private property which are illegally parked and vehicles involved in accidents. If a private business wants to select a towing company other than Auto Body Works, it would have to post a prescribed number of signs on its premises indicating its choice of wrecker service. The fact that individuals can request other towing services in limited circumstances does not prevent the exclusive contract awarded by the City from being, at a minimum, a partial franchise.

Under S.C. law, a municipality can grant, renew, or extend a franchise only by ordinance. S.C.Code Ann. § 5–7–260(4) (Supp.2000). A franchise is unenforceable and illegal unless made in conformity with the statute. *Berkley Elec. Co-op., Inc. v. Town of Mt. Pleasant,* 308 S.C. 205, 417 S.E.2d 579 (1992); 10 E. McQuillan, *The Law of Municipal Corporations* § 29.02 (3d ed.1990). Since the City has not produced an ordinance promulgated in accordance with section 5–7–260(4), the franchise contract is invalid.

### IV. Inverse Condemnation, Due Process, Impropriety, Three–Year Term, and Procurement Code

Because we find the contract between the City and Auto Body Works was an invalid franchise agreement, we do not address the remaining issues on appeal.

### CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the special referee and **REMAND** for a determination of what relief Quality is entitled to as a result of the FOIA violations.

MOORE and WALLER, JJ., concur.

BURNETT and PLEICONES, JJ., concurring in part and dissenting in part in a separate opinion.

---

*Cayce, supra* (in the traditional franchise situation, the municipality's residents and businesses are the franchisee's primary clientele).

PLEICONES, Justice:

I concur in part and respectfully dissent in part. I agree with the majority that Quality has shown a violation of the Freedom of Information Act. I disagree, however, with the majority's conclusion that the towing contract awarded to Auto Body Works was a franchise.

"[A] franchise is the privilege of doing that which does not belong to citizens of the country generally by common right. . . . ." *State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 35, 153 S.E. 537, 548 (1929). "Traditionally, governmental franchises are obtained by service-type businesses which seek the municipality's permission **to do business with the municipality's citizens,** and are willing to pay the municipality for this privilege." *City of Cayce v. AT & T Communications of Southern States, Inc.*, 326 S.C. 237, 241, 486 S.E.2d 92, 94 (1997) (emphasis added). In the traditional franchise situation, the municipality's residents and businesses are the franchisee's primary clientele. *Id.*

The Service Contract between City and Auto Body Works provide "towing and storage services shall be provided when requested by the City. . . ." It contains a provision specifically recognizing a vehicle owner may obtain towing and storage services from any wrecker service.

The Service Contract provides the City with specific services, and requires the City to pay for these services. Under the terms of the Service Contract, Auto Body Works provides services to City, not to City's citizens or businesses. Accordingly, the agreement between City and Auto Body Works is a contract, not a franchise. While the agreement also provides that Auto Body Works is the "default" towing service for certain individuals and businesses, in my view, this provision does not transform a routine procurement contract into a franchise. Similarly, as recognized by the majority, the 1995 Ordinance "instructed the City Manager to contract with one or more wrecker services to provide towing services **for the City.**" (emphasis added). While the 1995 Ordinance limited the businesses with which City contracted, it did not prevent other businesses from engaging in wrecker services for City's citizens. The 1995 Ordinance did not contemplate the granting of a franchise.

Since I would not decide the appeal on the franchise issue, I find it necessary to briefly address Quality's remaining claims. Quality's due process and inverse condemnation claims are predicated on its assertion of a "property interest" in remaining eligible to tow cars. The fact that Quality at one time had a definite term contract for towing services does not create a cognizable "property interest" in continuing to tow cars for the City. Further, I find no impropriety or violations of any procurement code in the award of this contract. Although the committee may not have conducted its activities in the most exemplary manner, the fact remains that its role was merely advisory. The contract was awarded by the City Manager and approved by the City Council. I can find no allegations or evidence of improprieties under those codes on their part. Finally, this three year contract is not impermissibly long. *Piedmont Pub. Serv. Dist. v. Cowart,* 319 S.C. 124, 459 S.E.2d 876 (Ct.App.1995), *aff'd* 324 S.C. 239, 478 S.E.2d 836 (1996). I would affirm the referee's rulings on these issues.

As noted above, I concur in the majority's conclusion that there were two violations of the FOIA, and therefore concur in the majority's decision to remand this matter to determine whether Quality is entitled to any relief under S.C.Code Ann. § 30–4–100 (1991).

BURNETT, J., concurs.